Robert A. WRIGHT and Deann
K. Wright, Plaintiffs,

v.

BROOKE GROUP LIMITED, Liggett & Myers, Inc., Liggett Group, Inc., Philip Morris Incorporated (Philip Morris USA), Philip Morris Companies, Inc., R.J. Reynolds Tobacco Company, and R.J.R. Nabisco, Inc., Defendants.

No. 01–0712.

Supreme Court of Iowa.

Oct. 9, 2002.

E. Ralph Walker, David J. Darrell, and Harley C. Erbe of Walker Law Firm, Des Moines, Steven P. Wandro, CeCelia Ibson Wagner, Elizabeth S. Hodgson, and Michelle M. Casper of Wandro, Lyons, Wagner & Baer, P.C., Des Moines, Glenn L. Norris, George F. Davison, Jr., and Carla T. Schemmel of Hawkins & Norris, P.C., Des Moines, and Norwood S. Wilner of Spohrer, Wilner, Maxwell & Matthews, P.A., of Jacksonville, Florida, for plaintiffs.

Robert A. Van Vooren and Thomas D. Waterman of Lane & Waterman, Davenport, and Timothy E. Congrove and J. Patrick Sullivan of Shook, Hardy & Bacon L.L.P., Kansas City, Missouri, for defendant Philip Morris Incorporated.

Steven L. Nelson and Kris Holub Tilley of Davis, Brown, Koehn, Shors & Roberts, Des Moines, and Robert H. Klonoff, Jeffrey J. Jones and J. Todd Kennard of Jones, Day, Reavis & Pogue, Washington, D.C. and Columbus, Ohio, for defendant R.J. Reynolds Tobacco Company.

Richard J. Sapp and Michael W. Thrall of Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., Des Moines, and Kevin M. Reynolds and Richard J. Kirschman of Whitfield & Eddy, P.L.C., Des Moines, for amicus curiae Iowa Defense Counsel Association and The Defense Research Institute, Inc.

TERNUS, Justice.

The United States District Court for the Northern District of Iowa has certified eight questions to this court arising out of a personal injury action filed by a smoker against several cigarette manufacturers. The certified questions address the nature and extent of the manufacturers' liability under products liability, warranty and tort law. In general, our answers can be summarized as follows: (1) in a design defect products liability case, Iowa applies the test set forth in Restatement (Third) of Torts: Product Liability sections 1 and 2 (1998); (2) a civil conspiracy claim may be based on conduct that does not constitute an intentional tort; (3) a product manufacturer's failure to warn or disclose material information will support a fraud claim by a customer only when disclosure is necessary to prevent a prior representation from being misleading; (4) a product manufacturer's advertisements and statements do not constitute an undertaking so as to create a duty under Restatement (Second) of Torts section 323 (1965); and (5) a cigarette manufacturer has no warranty or tort liability to a smoker based on a manufacturing defect when the cigarettes smoked by the plaintiff were in the condition intended by the manufacturer.

I. *Factual and Procedural Background.*

The plaintiffs, Robert and DeAnn Wright, filed a petition against the defen-

dants, all cigarette manufacturers, alleging they had been damaged as a result of Robert's cigarette smoking. (For the sake of simplicity, we will refer only to the plaintiff, Robert Wright, in the remainder of this opinion.) The specific claims made by the plaintiff include (1) negligence, (2) strict liability, (3) breach of implied warranty, (4) breach of express warranty, (5) breach of special assumed duty, (6) fraudulent misrepresentation, (7) fraudulent nondisclosure, and (8) civil conspiracy. The defendants filed a motion to dismiss that was largely overruled by the federal district court. *See Wright v. Brooke Group Ltd.*, 114 F.Supp.2d 797, 838 (N.D.Iowa 2000).

Thereafter, the defendants asked the federal court to certify questions of law to the Iowa Supreme Court pursuant to Iowa Code section 684A.1 (2001). Concluding the case presented several questions of state law that are potentially determinative and as to which there is either no controlling precedent or the precedent is ambiguous, the district court certified eight questions to this court.

The questions certified are:

1. In a design defect products liability case, what test applies under Iowa law to determine whether cigarettes are unreasonably dangerous? What requirements must be met under the applicable test?

2. Under Iowa law, can Defendants rely on Comment i of § 402A of the Restatement (Second) of Torts to show that cigarettes are not unreasonably dangerous?

3. Under Iowa law, does the common knowledge of the health risks associated with smoking, including addiction, preclude tort and warranty liability of cigarette manufacturers to smokers because cigarettes are not unreasonably danger-

ous insofar as the risks are commonly known? If yes, then:

a. [During] what period of time would such knowledge be common?

b. Is there a duty to warn of the risks associated with smoking cigarettes in light of such common knowledge?

c. Is reliance on advertisements, statements or representations suggesting that there are no risks associated with smoking, including addiction, justifiable in light of such common knowledge?

4. Under Iowa law, can Plaintiffs bring a civil conspiracy claim arising out of alleged wrongful conduct that may or may not have been an intentional tort— i.e., strict liability for manufacturing a defective product or intentionally agreeing to produce an unreasonably dangerous product?

5. Under Iowa law, can a manufacturer's alleged failure to warn or to disclose material information give rise to a fraud claim when the relationship between a Plaintiff and a Defendant is solely that of a customer/buyer and manufacturer?

6. Does an "undertaking" arise under § 323 of the Restatement (Second) of Torts, as adopted in Iowa, by reason of a product manufacturer's advertisements or statements directed to its customers?

7. Does Iowa law allow a Plaintiff to recover from a cigarette manufacturer under a manufacturing defect theory when the cigarettes smoked by Plaintiff were in the condition intended by the manufacturer?

8. Does Iowa law allow Plaintiff to recover from a cigarette manufacturer for breach of implied warranty of merchantability when the cigarettes smoked by Plaintiff were in the condition intended by the manufacturer and Plaintiff alleg-

es Defendants' cigarettes are "substantially interchangeable"?

We will answer the questions in the order propounded.

II. *In a Design Defect Products Liability Case, What Test Applies Under Iowa Law to Determine Whether Cigarettes Are Unreasonably Dangerous? What Requirements Must Be Met Under the Applicable Test?*

A. *Iowa law governing strict liability for defective products.* The Iowa Supreme Court first applied strict liability in tort for a product defect in 1970, adopting Restatement (Second) of Torts section 402A (1965). *Hawkeye–Sec. Ins. Co. v. Ford Motor Co.*, 174 N.W.2d 672, 684 (Iowa 1970). Section 402A provides:

Special Liability of Seller of Product for Physical Harm to User or Consumer:

(1) one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A. Our purpose in adopting this provision was to relieve injured plaintiffs of the burden of proving the elements of warranty or negligence theories, thereby insuring " 'that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market.' " *Hawkeye–Sec. Ins. Co.*, 174 N.W.2d at 683 (citation omitted).

Consistent with this purpose we held that a plaintiff seeking to recover under a strict liability theory need not prove the manufacturer's negligence. *Id.* at 684. Moreover, we concluded that application of strict liability in tort was not exclusive and did not " 'preclude liability based on the alternative ground of negligence, when negligence could be proved.' " *Id.* at 685 (citation omitted). Although *Hawkeye–Security* was a manufacturing defect case, *id.* at 676–77, our opinion implied that strict liability in tort was applicable to design defects as well, *id.* at 684 (quoting authority that strict liability is applicable when "the defect arose out of the design or manufacture" of the product).

In *Aller v. Rodgers Machinery Manufacturing Co.*, a design defect case, our court discussed in more detail the test to be applied in strict liability cases. 268 N.W.2d 830, 832 (Iowa 1978). In that case, the plaintiff asked the court to eliminate the "unreasonably dangerous" element of strict products liability, arguing that to require proof that the product was *unreasonably* dangerous injected considerations of negligence into strict liability, thwarting the purpose of adopting a strict liability theory. *Id.* at 833–34. We rejected the plaintiff's request to eliminate the "unreasonably dangerous" element, concluding the theories of strict liability and negligence were distinguishable:

In strict liability the plaintiff's proof concerns the condition (dangerous) of a product which is designed or manufactured in a particular way. In negligence the proof concerns the reasonableness of

the manufacturer's conduct in designing and selling the product as he did.

In strict liability the plaintiff takes the design as it was finalized in the finished product and shows it was both dangerous and that it was unreasonable to subject the user to this danger because the user would not contemplate the danger in the normal and innocent use of the product or consumption of the product. In negligence the plaintiff shows the manufacturer was unreasonable in designing the product as he did.

*Id.* at 835 (citation omitted).

These articulated distinctions were, however, somewhat obscured by this court's explanation of the proof required in a strict liability case. Relying on comment *i* to section 402A, we held that a plaintiff seeking to prove a product was in a "defective condition unreasonably dangerous" must show that the product was "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.* at 834 (quoting Restatement (Second) of Torts § 402A cmt. *i*). We went on, however, to discuss *how* the plaintiff is to prove the defective condition was unreasonably dangerous:

> In order to prove that a product is unreasonably dangerous, the injured plaintiff must prove the product is dangerous and that it was unreasonable for such a danger to exist. Proof of unreasonableness involves a balancing process. On one side of the scale is the utility of the product and on the other is the risk of its use.

Whether the doctrine of negligence or strict liability is being used to impose liability *the same process is going on in each instance,* i.e., weighing the utility of the article against the risk of its use.

*Id.* at 835 (emphasis added). Two conclusions can be drawn from our discussion in *Aller:* (1) the legal principles applied in a strict liability case include both a consumer expectation or consumer contemplation test and a risk/benefit or risk/utility analysis; and (2) the risk/benefit analysis employed in a strict liability design defect case is the same weighing process as that used in a negligence case.

Since *Aller,* this court has varied in its application of the tests set forth in that decision, sometimes applying both tests and sometimes applying only the consumer expectation test. On the other hand, we have continued to equate the strict liability risk/benefit analysis used in a design defect case with that applied in a design negligence case.

In *Chown v. USM Corp.,* 297 N.W.2d 218, 220 (Iowa 1980), a design defect case, we noted that proof of unreasonable danger was an essential element under both strict liability and negligence. We also observed there were two tests to determine this element, a consumer expectation test and a risk/benefit analysis. *Chown,* 297 N.W.2d at 220–21. This court then proceeded to apply both tests in deciding the trial court had not erred in ruling that the plaintiff failed to prove the essential element of unreasonable danger. *Id.* at 221. Finding no error, we held the absence of an "unreasonably dangerous" product was fatal to both the plaintiff's design negligence and strict liability design defect claims. *Id.*

In *Fell v. Kewanee Farm Equipment Co.,* 457 N.W.2d 911, 916–18 (Iowa 1990), this court again applied both the consumer expectation and risk/benefit tests in a strict liability design defect case. *Accord Mercer v. Pittway Corp.,* 616 N.W.2d 602, 619–20 (Iowa 2000) (applying both tests). In contrast, some of our cases appear to analyze the element of "unreasonably dan-

gerous" under the consumer expectation test alone. *See Weyerhaeuser Co. v. Thermogas Co.,* 620 N.W.2d 819, 828 (Iowa 2000) (applying consumer expectation test without comment on risk/utility analysis); *Maguire v. Pabst Brewing Co.,* 387 N.W.2d 565, 569–70 (Iowa 1986) (same).

One final development in products liability law in Iowa is worth mentioning before we address the precise issue in this case. In *Olson v. Prosoco,* 522 N.W.2d 284 (Iowa 1994), this court rejected the distinction between negligence and strict liability claims first articulated in *Aller. Olson,* 522 N.W.2d at 289. Examining a failure-to-warn case, we abandoned the analysis that differentiated strict liability from negligence on the basis that negligence focuses on the defendant's conduct while strict liability focuses on the condition of the product. *Id.* We concluded that "[i]nevitably the conduct of the defendant in a failure to warn case becomes the issue," and therefore, the product/conduct distinction had "little practical significance." *Id.* Our acknowledgement that the test for negligence and strict liability were in essence the same led this court to discard the theory of strict liability in failure-to-warn cases and hold that such claims should be submitted under a theory of negligence only. *Id.*

With this abbreviated review of the current status of Iowa product liability law in mind, we turn now to the parties' arguments on the question of the applicable test for determining whether cigarettes are unreasonably dangerous.

B. *Arguments of parties.* The parties disagree as to whether the consumer contemplation test and the risk/benefit analysis are alternative tests or whether both apply in all product defect cases. Assuming the tests are alternative, the parties also differ on which test applies to cigarette cases.

The defendants assert that only the consumer contemplation test of comment *i* to section 402A should be used to determine whether cigarettes are unreasonably dangerous. Their desire for this test stems from their related argument that common knowledge of the risks of cigarette smoking precludes a finding that cigarettes are dangerous "to an extent beyond that which would be contemplated by the ordinary consumer." Restatement (Second) of Torts § 402A cmt. *i.* The defendants argue that the risk/utility test should not be applied because it was designed for those products, unlike cigarettes, "about which the ordinary consumer would not normally have an expectation of safety or dangerousness."

The plaintiff contends both the consumer contemplation and risk/utility tests apply in design defect cases to determine whether a product is unreasonably dangerous. Alternatively, he suggests this case presents an appropriate opportunity for the court to adopt the principles of law set forth in section 2 of Restatement (Third) of Torts: Product Liability [hereinafter "Products Restatement"]. As a final option, he argues that "[s]ince the cigarette companies disputed for decades that their products were dangerous, [cigarettes] would not be products for which consumers would normally have an expectation of safety or dangerousness decades in the past," thus qualifying for the risk/utility test under the analytical scheme proposed by the defendants.

■ C. *Discussion.* In determining what test should be applied in assessing whether cigarettes are unreasonably dangerous, we are confronted with the anomaly of using a risk/benefit analysis for purposes of strict liability based on defective design that is identical to the test employed in proving negligence in product

design. *See Hillrichs v. Avco Corp.*, 478 N.W.2d 70, 75 (Iowa 1991) (noting, with respect to allegation of enhanced injury due to a design defect, that standards applied in that case "make the strict liability claim depend on virtually the same elements of proof as are required to establish the negligence claim"), *overruled on other grounds by Reed v. Chrysler Corp.*, 494 N.W.2d 224, 230 (Iowa 1992). This incongruity has drawn our attention once again to the "debate over whether the distinction between strict liability and negligence theories should be maintained when applied to a design defect case." *Lovick v. Wil–Rich*, 588 N.W.2d 688, 698 (Iowa 1999). We are convinced such a distinction is illusory, just as we found no real difference between strict liability and negligence principles in failure-to-warn cases. *See Olson*, 522 N.W.2d at 289; *Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 69–70 (Ky.1973) (finding no difference between standards of conduct under strict liability and negligence in design defect case: "In either event the standard required is reasonable care."). *See generally* David Owen, *Products Liability Law Restated*, 49 S.C. L.Rev. 273, 286 (1998) ("It long has been an open secret that, while purporting to apply 'strict' liability doctrine to design and warnings cases, courts in fact have been applying principles that look remarkably like negligence.") [hereinafter "Owen"]. Because the Products Restatement is consistent with our conclusion, we think it sets forth an intellectually sound set of legal principles for product defect cases.

■ Before we discuss these principles, we first explain our dissatisfaction with the consumer expectation test advocated by the defendants. As one writer has suggested, the consumer expectation test in reality does little to distinguish strict liability from ordinary negligence:

The consumer expectations test for strict liability operates effectively when the product defect is a construction or manufacturing defect.... An internal standard exists against which to measure the product's condition—the manufacturer's own design standard. In essence, a product flawed in manufacture frustrates the manufacturer's own design objectives. Liability is imposed on manufacturers in these cases even if the manufacturer shows it acted reasonably in making the product....

When the claim of defect is based on the product's plan or design, however, the consumer expectations test is inadequate. The test seems to function as a negligence test because a consumer would likely expect the manufacturer to exercise reasonable care in designing the product and using the technology available at that time.... Although the consumer expectations test purports to establish the manufacturer's conduct is unimportant, it does not explain what truly converts it into a standard of strict liability.

Keith Miller, *Design Defect Litigation in Iowa: The Myths of Strict Liability*, 40 Drake L.Rev. 465, 473–74 (1991). We agree that the consumer contemplation test is inadequate to differentiate a strict liability design defect claim from a negligent design case. *Cf. Olson*, 522 N.W.2d at 289 (concluding there was no real difference between the tests used in negligent failure to warn and strict liability based on a failure to warn, noting "[i]nevitably the conduct of the defendant ... becomes the issue"). Consequently, any attempts to distinguish the two theories in the context of a defective design are in vain. That brings us to the Products Restatement, which reflects a similar conclusion by its drafters.

The Products Restatement demonstrates a recognition that strict liability is appropriate in manufacturing defect cases, but negligence principles are more suitable for other defective product cases. *See* 2 Dan B. Dobbs, *The Law of Torts* § 353, at 977 (2001) ("The effect ... of the Products Restatement is that strict liability is retained when it comes to product flaws, but negligence or something very much like it is the test of liability when it comes to design and warning defects.") [hereinafter "Dobbs"]; Daniel Givelber, *Cigarette Law,* 73 Ind. L.J. 867, 885 (1998) ("Some thirty years after the Restatement's [ (Second) of Torts] apparent embrace of strict products liability, the dominant rule in American law appears to be that manufacturers are only strictly liable when they make a product different and more dangerous from that intended."). Accordingly, it "establish[es] separate standards of liability for manufacturing defects, design defects, and defects based on inadequate instructions or warnings." Products Restatement § 2 cmt. *a,* at 14. Initially, section 1 of the Products Restatement provides:

> One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect.

Products Restatement § 1, at 5. The "unreasonably dangerous" element of section 402A has been eliminated and has been replaced with a multi-faceted definition of defective product. This definition is set out in section 2:

> A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warning. A product:
>
> (a) contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product;
>
> (b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;
>
> (c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.

Products Restatement § 2, at 14.

The commentators give the following explanation for the analytical framework adopted in the Products Restatement:

> In contrast to manufacturing defects, design defects and defects based on inadequate instructions or warnings are predicated on a different concept of responsibility. In the first place, such defects cannot be determined by reference to the manufacturer's own design or marketing standards because those standards are the very ones that the plaintiffs attack as unreasonable. Some sort of independent assessment of advantages and disadvantages, to which some attach the label "risk-utility balancing," is necessary. Products are not generically defective merely because they are dangerous. Many product-related accident costs can be eliminated only by excessively sacrificing product features that make products useful and desirable. Thus, the various trade-offs need to be

considered in determining whether accident costs are more fairly and efficiently borne by accident victims, on the one hand, or, on the other hand, by consumers generally through the mechanism of higher product prices attributable to liability costs imposed by the courts on product sellers.

Products Restatement § 2 cmt. *a*, at 15–16. As we noted in *Lovick*, the Products Restatement has essentially "dropped the consumer expectation test traditionally used in the strict liability analysis and adopted a risk-utility analysis traditionally found in the negligence standard." *Lovick*, 588 N.W.2d at 698; *accord* Products Restatement § 2 cmt. *n*, at 36 ("Regardless of the doctrinal label attached to a particular claim, design and warning claims rest on a risk-utility assessment."); Owen, 49 S.C. L.Rev. at 285–86 ("Thus, the Products Liability Restatement grounds liability for design and warnings defects in the reasonableness-balancing-negligence concepts that properly dominate the law of tort.").

■ In addition, the Products Restatement does not place a conventional label, such as negligence or strict liability, on design defect cases.

> The rules in this Section and in other provisions of this Chapter define the bases of tort liability for harm caused by product defects existing at the time of sale or other distribution. The rules are stated functionally rather than in terms of traditional doctrinal categories. Claims based on product defect at time of sale or other distribution must meet the requisites set forth in Subsection (a), (b), or (c), or the other provisions in this Chapter. As long as these requisites are met, doctrinal tort categories such as negligence or strict liability may be utilized in bringing the claim.

Products Restatement § 2 cmt. *n*, at 34–35. We question the need for or usefulness of *any* traditional doctrinal label in design defect cases because, as comment *n* points out, a court should not submit both a negligence claim and a strict liability claim based on the same design defect since both claims rest on an identical risk-utility evaluation. *Id.* at 36. Moreover, to persist in using two names for the same claim only continues the dysfunction engendered by section 402A. Therefore, we prefer to label a claim based on a defective product design as a design defect claim without reference to strict liability or negligence.

■ *D. Conclusion.* In summary, we now adopt Restatement (Third) of Torts: Product Liability sections 1 and 2 for product defect cases. Under these sections, a plaintiff seeking to recover damages on the basis of a design defect must prove "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe." *Id.* § 2(b); *accord Hawkeye Bank v. State*, 515 N.W.2d 348, 352 (Iowa 1994) (requiring "proof of an alternative safer design that is practicable under the circumstances" in negligent design case); *Hillrichs*, 478 N.W.2d at 75 (requiring "proof of an alternative safer design" under a theory of enhanced injury caused by a design defect).

III. *Under Iowa Law, Can Defendants Rely on Comment i of § 402A of the Restatement (Second) of Torts to Show That Cigarettes Are Not Unreasonably Dangerous?*

■ Comment *i* of section 402A addresses the "unreasonably dangerous" element of strict liability and sets forth the

consumer contemplation test considered above. It discusses the necessity of proof that the product is dangerous "to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts § 402A cmt. *i*, at 352. In the course of this discussion, the comment states: "Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful...." Relying on this statement, the defendants assert "[d]esign defect claims involving cigarettes fail as a matter of law because cigarettes are not unreasonably dangerous under comment *i*."

Because we have abandoned section 402A and the requirement of unreasonably dangerous, comment *i* does not apply to the case before us. Therefore, the defendants cannot rely on the statement made in comment *i* pertaining to tobacco.

IV. *Under Iowa Law, Does the Common Knowledge of the Health Risks Associated With Smoking, Including Addiction, Preclude Tort and Warranty Liability of Cigarette Manufacturers to Smokers Because Cigarettes Are Not Unreasonably Dangerous Insofar as the Risks Are Commonly Known?* [1]

■ Our initial answer to this question is that our adoption of sections 1 and 2 of the Products Restatement renders unnecessary any examination of the unreasonable dangerousness of cigarettes as that test is used in section 402A. Moreover, "consumer expectations do not constitute an independent standard for judging the defectiveness of product designs" under section 2. *See* Products Restatement § 2 cmt. *g*, at 27. Therefore, the common knowledge of consumers of the health risks associated with smoking does not necessarily preclude liability.

■ Although consumer expectations are not the sole focus in evaluating the defectiveness of a product under the Products Restatement, consumer expectations remain relevant in design defect cases. Comment *g* to section 2 states:

[C]onsumer expectations about product performance and the dangers attendant to product use affect how risks are perceived and relate to foreseeability and frequency of the risks of harm, both of which are relevant under Subsection (b). See Comment *f*. Such expectations are often influenced by how products are portrayed and marketed and can have a significant impact on consumer behavior. Thus, although consumer expectations do not constitute an independent standard for judging the defectiveness of product designs, they may substantially influence or even be ultimately determinative on risk-utility balancing in judg-

---

1. The third certified question also contains three subparts:

 a. [During] what period of time would such knowledge be common?

 b. Is there a duty to warn of the risks associated with smoking cigarettes in light of such common knowledge?

 c. Is reliance on advertisements, statements or representations suggesting that there are no risks associated with smoking, including addiction, justifiable in light of such common knowledge?

We decline to answer these questions because they are questions of fact or require factual determinations that are not within the reach of chapter 684A. *See* Iowa Code § 684A.1 ("The supreme court may answer *questions of law* certified to it...." (Emphasis added.)). The common knowledge of consumers during the lengthy time period at issue in this case is a factual issue beyond the scope of this certified-question proceeding.

ing whether the omission of a proposed alternative design renders the product not reasonably safe.

Subsection (b) likewise rejects conformance to consumer expectations as a defense. *The mere fact that a risk presented by a product design is open and obvious, or generally known, and that the product thus satisfies expectations, does not prevent a finding that the design is defective.* But the fact that a product design meets consumer expectations may substantially influence or even be ultimately determinative on risk-utility balancing in judging whether the omission of a proposed alternative design renders the product not reasonably safe. It follows that, while disappointment of consumer expectations may not serve as an independent basis for allowing recovery under Subsection (b), neither may conformance with consumer expectations serve as an independent basis for denying recovery. Such expectations may be relevant in both contexts, but in neither are they controlling.

*Id.* § 2 cmt. *g*, at 27–28 (emphasis added). Thus, while consumer expectations are generally not determinative in a design defect case, they are one factor to be considered in deciding "whether an alternative design is reasonable and whether its omission renders a product not reasonably safe." *Id.* § 2 cmt. *f*, at 23.

Consumer knowledge also remains relevant to failure-to-warn claims.

In general, a product seller is not subject to liability for failing to warn or instruct regarding risks and risk-avoidance measures that should be obvious to, or generally known by, foreseeable product users. When a risk is obvious or generally known, the prospective addressee of a warning will or should already know of its existence. Warning of an obvious or generally known risk in most instances will not provide an effective additional measure of safety. Furthermore, warnings that deal with obvious or generally known risks may be ignored by users and consumers and may diminish the significance of warnings about non-obvious, not-generally-known risks. Thus, requiring warnings of obvious or generally known risks could reduce the efficacy of warnings generally. When reasonable minds may differ as to whether the risk was obvious or generally known, the issue is to be decided by the trier of fact.

*Id.* § 2 cmt. *j*, at 31.

In summary, consumer knowledge is merely one factor in assessing liability for design defects or for failure to warn of product risks. We cannot say at this stage of the proceedings prior to any factual determination of the common knowledge of consumers during the relevant time frame whether such knowledge would, as a matter of law, preclude liability under the principles set forth in the Products Restatement.

V. *Under Iowa Law, Can Plaintiffs Bring a Civil Conspiracy Claim Arising Out of Alleged Wrongful Conduct That May or May Not Have Been an Intentional Tort— i.e., Strict Liability for Manufacturing a Defective Product or Intentionally Agreeing to Produce an Unreasonably Dangerous Product?*

 Under Iowa law, "[a] conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful." *Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 232 (Iowa 1977). Our court has also relied on the principles stated in the Restatement (Second) of Torts section 876 to set the parameters of this claim:

Under the Restatement, a person becomes subject to liability for harm caused by the *tortious* conduct of another when that person: (a) does a *tortious* act in concert with the other or pursuant to a common design with the other (traditional conspiracy)....

*Ezzone v. Riccardi*, 525 N.W.2d 388, 398 (Iowa 1994) (emphasis added) (citing Restatement (Second) of Torts § 876, at 315 (1979)). Under this theory of liability, "an agreement must exist between the two persons to commit *a wrong* against another." *Id.* (emphasis added).

■ "Civil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy [that] give rise to the action." *Basic Chems.*, 251 N.W.2d at 233; *accord Adam v. Mt. Pleasant Bank & Trust Co.*, 387 N.W.2d 771, 773 (Iowa 1986). Thus, conspiracy is merely an avenue for imposing vicarious liability on a party for the wrongful conduct of another with whom the party has acted in concert. *See John's Insulation, Inc. v. Siska Constr. Co.*, 774 F.Supp. 156, 162 (S.D.N.Y.1991) ("Allegations of a civil conspiracy, therefore, are proper only for the purpose of establishing joint liability by co-participants in tortious conduct."); 2 Dobbs § 340, at 936–37 (characterizing cases applying a civil conspiracy theory as employing a model of vicarious liability). Thus, the wrongful conduct taken by a co-conspirator must itself be actionable. *See John's Insulation, Inc.*, 774 F.Supp. at 161 ("A claimant must plead specific wrongful acts which constitute an independent tort."); *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.*, 88 Md.App. 672, 596 A.2d 687, 700 (1991) ("[T]he act (or means)

need only be 'of such a character as to create an actionable wrong.'" (citation omitted)); 16 Am.Jur.2d *Conspiracy* § 50, at 275–76 (1998) ("[I]f the acts alleged to constitute the underlying wrong provide no cause of action, then neither is there a cause of action for the conspiracy itself.").

Although our cases applying a civil conspiracy theory involve agreements to commit an intentional tort, *e.g., Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 768 (Iowa 1999) (interference with contract); *Ezzone*, 525 N.W.2d at 392 (interference with contract); *Adam*, 387 N.W.2d at 775 (fraud); *Basic Chems.*, 251 N.W.2d at 232 (unfair competition), our court has never held that a claim of civil conspiracy must be based on such an agreement. Moreover, our reliance on section 876 of the Restatement would seem to indicate an inclination to apply civil conspiracy whenever the underlying conduct was simply tortious. Although the Restatement (Second) of Torts takes no position on whether section 876 applies when the actor's conduct involves strict liability,[2] the comments to section 876 state "it is essential that the conduct of the actor be itself *tortious.*" *See* Restatement (Second) of Torts § 876 cmt. *c*, at 316 (emphasis added); *accord* 2 Dobbs § 340, at 936 ("Conspiracy is not a tort in itself; it reflects the conclusion that each participant should be liable for the *tortious* course of conduct." (Emphasis added.)). In addition, the comments include an illustration predicated on conduct that does not necessarily include an intent to do harm. *See* Restatement (Second) of Torts § 876 cmt. *a*, illus. 1, at 316 (setting forth example involving co-conspirators who were racing on public highway).

**2.** Because we have abandoned strict liability as a basis for design defect cases and failure-to-warn cases and because we conclude, as we later discuss, that the present case does not present an actionable manufacturing defect claim, we need not determine whether a civil conspiracy claim can be based on conduct that subjects the actor to liability under a strict liability theory.

Notwithstanding the lack of support in general legal authorities for a requirement that the tortious conduct of the actor be intentional, some jurisdictions require that a civil conspiracy claim be based on an intentional tort, not simple negligence. *E.g., Sonnenreich v. Philip Morris Inc.,* 929 F.Supp. 416, 419 (S.D.Fla.1996); *Campbell v. A.H. Robins Co.,* 615 F.Supp. 496, 500 (W.D.Wis.1985); *Altman v. Fortune Brands, Inc.,* 268 A.D.2d 231, 701 N.Y.S.2d 615, 615 (2000); *N. Am. Van Lines, Inc. v. Emmons,* 50 S.W.3d 103, 116 (Tex.App.2001); *accord* 16 Am.Jur.2d *Conspiracy* § 51, at 278 (1998). These authorities suggest that since civil conspiracy is an intentional tort, it is illogical to conclude that persons can conspire to commit negligence. *E.g., Sonnenreich,* 929 F.Supp. at 419; *Campbell,* 615 F.Supp. at 497. We think this reasoning is faulty.

In *Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 206 Ill.Dec. 636, 645 N.E.2d 888 (1995), the plaintiff sued his former employer and its successor, alleging that his employer, a manufacturer of asbestos, conspired with other manufacturers to suppress information about the hazards of asbestos exposure. 206 Ill.Dec. 636, 645 N.E.2d at 891–92. In rejecting the defendant's argument that an action for civil conspiracy does not arise unless one of the conspirators commits an intentional tort in furtherance of the conspiracy, the court stated:

> While a civil conspiracy is based upon intentional activity, the element of intent is satisfied when a defendant knowingly and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner. There is no such thing as accidental, inadvertent or negligent participation in a conspiracy. A defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy. A defendant who

understands the general objectives of the conspiratorial scheme, accepts them, and agrees ... to do its part to further those objectives, however, is liable as a conspirator. Once a defendant knowingly agrees with another to commit an unlawful act or a lawful act in an unlawful manner, that defendant may be held liable for any tortious act committed in furtherance of the conspiracy, whether such tortious act is intentional or negligent in nature.

*Id.* at 894–95 (citations omitted).

We disagree with those courts that conclude an agreement to be negligent is a non sequitur. For example, the plaintiff in *Adcock* alleged "asbestos manufacturers engaged in an industrywide conspiracy to conceal and affirmatively misstate the hazards associated with asbestos exposure" and "performed tortious acts in furtherance of the conspiracy." *Id.* at 895. There is nothing illogical or nonsensical about this scenario: manufacturers agree to suppress information about their product for the lawful purpose of facilitating the sale of their product, and in effectuating this plan subject themselves to liability for failure to warn of the risks of using their product. So long as the underlying actionable conduct is of the type that one can plan ahead to do, it should not matter that the legal system allows recovery upon a mere showing of unreasonableness (negligence) rather than requiring an intent to harm.

■■■ Amicus curiae argue that to adopt this position will greatly extend the reach of civil conspiracy claims in the area of products liability. They contend that under this theory "[e]very company that belongs to a trade association, industry group, or product advisory group would face conspiracy charges predicated on nothing more than the fact that it manufactured a product that had characteristics of those within that industry." Under the

principles announced today, however, we do not think liability could properly be imposed under the facts suggested by amicus curiae. Liability for civil conspiracy requires an agreement between the actor and the party sought to be held liable. *See Ezzone*, 525 N.W.2d at 398; Restatement (Second) of Torts § 876 cmt. *a*, at 316. An agreement sufficient to impose liability results only from a defendant's knowing and voluntary participation in a common scheme to take action, lawful or unlawful, that ultimately subjects the actor to liability to another. *See* 16 Am.Jur.2d *Conspiracy* § 51, at 276 (stating there must be "a meeting of the minds"); *see also McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102, 241 Ill.Dec. 787, 720 N.E.2d 242, 259 (1999) ("[P]arallel conduct may serve as circumstantial evidence of a civil conspiracy among manufacturers of the same or similar products but is insufficient proof, by itself, of the agreement element of this tort."). Consequently, a company's mere membership in an industry group would not make that company liable for the tortious acts of other members of the group.

■ In summary, the plaintiff may base a claim of civil conspiracy on wrongful conduct that does not constitute an intentional tort. Such underlying acts must, however, be actionable in the absence of the conspiracy.

VI. *Under Iowa Law, Can a Manufacturer's Alleged Failure to Warn or to Disclose Material Information Give Rise to a Fraud Claim When the Relationship Between a Plaintiff and a Defendant Is Solely That of a Customer/Buyer and Manufacturer?* [3]

■ Under Iowa law, the failure to disclose material information can consti-

tute fraud *if* the concealment is made "by a party under a duty to communicate the concealed fact." *Cornell v. Wunschel*, 408 N.W.2d 369, 374 (Iowa 1987); *see also* Restatement (Second) of Torts § 557A, at 149 (1977) (stating that the tort of fraud may serve as a basis for the recovery of damages for physical harm to the person or property of one who justifiably relies on the defendant's "fraudulent ... nondisclosure of a fact *that it is [the defendant's] duty to disclose*" (emphasis added)). The issue presented by the certified question is whether a manufacturer has a duty to communicate "material information" to the ultimate user of the manufacturer's product.

In the past, this court has recognized a duty to disclose in situations where the plaintiff and the defendant were involved in some type of business transaction, such as buyer/seller or owner/contractor. *See Clark v. McDaniel*, 546 N.W.2d 590, 592–93 (Iowa 1996) (buyer and seller of used vehicle); *Cornell*, 408 N.W.2d at 376 (defendant represented wife in sale of hotel to the plaintiff); *Kunkle Water & Elec., Inc. v. City of Prescott*, 347 N.W.2d 648, 653–54 (Iowa 1984) (defendant to counterclaim contracted with counterclaim plaintiff to repair counterclaim plaintiff's water system). In such circumstances, we have held that an actionable misrepresentation may occur "when one with superior knowledge, *dealing with* inexperienced persons who rely on him or her, purposely suppresses the truth respecting a material fact involved in the transaction." *Kunkle Water & Elec.*, 347 N.W.2d at 653 (emphasis added); *accord Cornell*, 408 N.W.2d at 376. This principle is consistent with the Restatement's imposition of a duty to disclose

---

**3.** In responding to this question, we interpret the inquiry to be focused on liability for non-

disclosure as opposed to liability for affirmative misrepresentations.

facts basic to the transaction, if [the defendant] knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551(2)(e), at 119.

■ This court has also held that a duty to disclose may arise from the "attendant circumstances," such as a " 'contrivance intended to exclude suspicion and prevent inquiry.'" *Wilden Clinic, Inc. v. City of Des Moines,* 229 N.W.2d 286, 293 (Iowa 1975) (quoting 37 Am.Jur.2d *Fraud and Deceit* § 145 (1968)) (involving dispute between buyer and seller of land). This position is in accord with the Restatement (Second) of Torts, which provides:

> One party *to a business transaction* is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>
> . . .
>
> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading . . . .

Restatement (Second) of Torts § 551(2)(b) (emphasis added); *accord Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 7 F.Supp.2d 277, 290–91 (S.D.N.Y.1998); 2 Dobbs § 481, at 1375 (stating that an "[a]ffirmative dut[y] of disclosure [is] imposed when . . . the defendant has communicated a half-truth, that is, a partial or ambiguous statement that is misleading unless additional facts are disclosed"). A similar factual situation giving rise to a duty to disclose occurs when a party acquires information "that he knows will make untrue or misleading a previous representation that when made was true or believed to be so." Restate-

ment (Second) of Torts § 551(2)(c). A party must use reasonable care to disclose such subsequently acquired information to another party who has relied on the prior representation. *Id.; Glassner v. R.J. Reynolds Tobacco Co.,* 223 F.3d 343, 352 (6th Cir.2000); *Jones v. Am. Tobacco Co.,* 17 F.Supp.2d 706, 719 (N.D.Ohio 1998).

Whether a manufacturer owes a duty to disclose material information to a consumer turns, we think, on two issues: (1) is the nature of the relationship between a consumer and a manufacturer of the type to which such a duty should attach even in the absence of any direct dealing between the parties; and (2) does the duty of a manufacturer to a consumer encompass a general duty "to warn or to disclose material information" or is it limited to a duty to correct misleading statements made by the manufacturer? For reasons that follow, we conclude a manufacturer has a duty to a consumer under Restatement (Second) of Torts section 551(2)(b) to disclose "matters known to [the manufacturer] that [it] knows to be necessary to prevent [its] partial or ambiguous statement of the facts from being misleading" and under section 551(2)(c) to disclose subsequently acquired information that would prevent a prior statement from being false or misleading.

Iowa cases applying a fraud theory have typically involved a business transaction between the parties, a fact not present in the certified question submitted here. Generally there is no "dealing" between a manufacturer and the ultimate consumer of the manufacturer's product. Thus, the communication *between* two parties giving rise to one party's reliance on the other to disclose facts material to the first party's decision to enter into the transaction is lacking. *See Moore v. Fenex, Inc.,* 809 F.2d 297, 303 n. 2 (6th Cir.1987) ("We are aware of no case, nor has any been cited,

where a party has been liable for fraudulent nondisclosure that had no direct dealings with the plaintiff."). *But see Clark v. McDaniel*, 546 N.W.2d 590, 592–94 (Iowa 1996) (holding used-car dealer liable to subsequent purchaser for fraudulent nondisclosure pursuant to Restatement (Second) of Torts § 533 (1977), which extends liability to third parties whom the defendant has reason to expect will hear and rely on misinformation).

On the other hand, there is support in Iowa case law for the conclusion that the intentional tort of fraud is not necessarily limited to parties dealing directly with each other. In *Markworth v. State Savings Bank*, 212 Iowa 954, 237 N.W. 471 (1931), this court noted that an action for fraud "can only be brought by the one to whom the fraudulent representations were made." 212 Iowa at 960, 237 N.W. at 474. In explaining this limitation, however, the court quoted "approvingly" from a noted treatise on torts that belied such a narrow application of the tort:

> "No one has a right to accept and rely upon the representations of others but those to influence whose action they were made. * * * When statements are made for the express purpose of influencing the action of another, it is to be assumed they are made deliberately, and after due inquiry, and it is no hardship to hold the party making them to their truth. But he is morally accountable to no person whomsoever but the very person he seeks to influence."

*Id.* at 960–61, 237 N.W. at 474 (citation omitted). We conclude from this discussion that what is really important is that the statements were made for the purpose of influencing the action of another. The fact that this element is usually found in transactions where the parties deal directly with one another does not mean that the same goal of influencing another's ac-

tion cannot be present in business transactions that do not involve direct contact between the plaintiff and the defendant. *See Small v. Lorillard Tobacco Co.*, 176 Misc.2d 413, 672 N.Y.S.2d 601, 611 (Sup. Ct.1997) (holding that manufacturer could be held liable for fraud where the misrepresentations were "made to the public at large for the purpose of influencing the action of anyone who may act upon those representations"); *Williams v. Philip Morris Inc.*, 182 Or.App. 44, 48 P.3d 824, 832 (2002) (holding that smoker was required to prove he was "within a class of people whom defendant [cigarette manufacturer] intended to be recipients of and to rely on the [misleading statements]"). We hold, therefore, that a manufacturer who makes statements for the purpose of influencing the purchasing decisions of consumers has a duty to disclose sufficient information so as to prevent the statements made from being misleading, as well as a duty to reveal subsequently acquired information that prevents a prior statement, true when made, from being misleading.

We decline to extend the duty of disclosure in this context to a general duty to warn, or a duty to disclose under Restatement section 551(2)(e). *See Estate of White ex rel. White v. R.J. Reynolds Tobacco Co.*, 109 F.Supp.2d 424, 431 (D.Md. 2000) (refusing to impose duty to disclose based on mere relationship of manufacturer and buyer); *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 593 (1996) (same). *See generally* Restatement (Second) of Torts § 551(2)(e) (imposing a duty to disclose "facts basic to the transaction" when such disclosure would be expected based on the nature of the transaction). Principles of products liability law define the duties of disclosure owed by a manufacturer to a consumer arising out of their relationship as such.

■ In summary, a manufacturer's failure to warn or to disclose material information does not give rise to a fraud claim when the relationship between a plaintiff and a defendant is solely that of a customer/buyer and manufacturer with two exceptions. Those exceptions are limited to instances where the manufacturer (1) has made misleading statements of fact intended to influence consumers, or (2) has made true statements of fact designed to influence consumers and subsequently acquires information rendering the prior statements untrue or misleading. *See* Restatement (Second) of Torts § 551(2)(b), (c). Under these circumstances, a manufacturer's failure to disclose material information that would prevent his statement of the facts from being misleading can give rise to a fraud claim.[4]

VII. *Does an "Undertaking" Arise Under § 323 of the Restatement (Second) of Torts, as Adopted in Iowa, by Reason of a Product Manufacturer's Advertisements or Statements Directed to Its Customers?*

Restatement (Second) of Torts section 323 has been characterized as defining the liability of a "good samaritan." *See, e.g., Good v. Ohio Edison Co.,* 149 F.3d 413, 420 (6th Cir.1998); *Gunsalus v. Celotex Corp.,* 674 F.Supp. 1149, 1157 (E.D.Pa. 1987). It provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to

the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

> (a) his failure to exercise such care increases the risk of such harm, or

> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323; *see also Jain v. State,* 617 N.W.2d 293, 299–300 (Iowa 2000) (discussing requirements for claim made under section 323).

■ Preliminarily, it seems obvious from the text of this provision that not every statement made by a manufacturer, whether in an advertisement or otherwise, could constitute an undertaking under section 323. Only when the advertisement or statement indicates that the manufacturer intends to render *services to another* that are necessary for *the other's* protection is liability under section 323 even possible. Thus, we agree with the United States Court of Appeals for the Third Circuit that a manufacturer's mere marketing of its product does not constitute an "undertaking to inform the public about the known risks of its products." *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 936 (3d Cir. 1999).

Even though our discussion could end here, we assume, based on the allegations in the petition, that the certified question contemplates the advertisement or statement made by the product manufacturer is something more than mere marketing. Thus, we will proceed with the understanding that the advertisement or statement

---

4. We express no opinion on whether such claims would be preempted by the Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331–1340. *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 527–30,112 S.Ct. 2608, 2623–24, 120 L.Ed.2d 407, 429–31 (1992); *Burton v. R.J. Reynolds Tobacco Co.,* 208 F.Supp.2d 1187, 1206 (D.Kan.2002);

*Cantley v. Lorillard Tobacco Co.,* 681 So.2d 1057, 1061 (Ala.1996); *Laschke v. Brown & Williamson Tobacco Corp.,* 766 So.2d 1076, 1078 (Fla.Dist.Ct.App.2000); *Small v. Lorillard Tobacco Co.,* 252 A.D.2d 1, 679 N.Y.S.2d 593, 603–04 (1998); *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 439–40 (Tex.1997).

this court is asked to consider is one similar to that alleged by the plaintiff in his petition. Here, the plaintiff alleges that the defendants promised to "report honestly and competently on all research regarding smoking and health regarding their tobacco products through their public pronouncements."

■ We do not think the defendants' statements that they would report on the results of their research into the health effects of cigarette smoking was an undertaking to render a service to its customers. As one court has concluded in rejecting section 323 liability based on similar statements by tobacco companies, the defendants, by making these statements, did not undertake "to do anything specific for any particular person or entity." *Ky. Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F.Supp.2d 755, 774 (W.D.Ky. 1998) (considering manufacturers' public expression of "interest in the public health" and pledge of "resources to assist the scientific and public health communities with tobacco research"). Other courts are in accord with this result. *See Serv. Employees Int'l Union Health & Welfare Fund v. Philip Morris, Inc.*, 83 F.Supp.2d 70, 93 (D.D.C.1999), *rev'd on other grounds*, 249 F.3d 1068 (D.C.Cir. 2001) (rejecting section 323 liability based on similar statements made by cigarette manufacturers to the general public, ruling such statements "must be made directly to the [smoker], not to the general public through advertisements"); *Ark. Carpenters' Health & Welfare Fund v. Philip Morris Inc.*, 75 F.Supp.2d 936, 944 (E.D.Ark.1999) (holding that similar statements by cigarette manufacturer were insufficient to support liability under section 323); *Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F.Supp.2d 236, 245–46 (D.Mass.1999) (dismissing section 323 claim brought by employee health benefit plan to recover expenses it paid for its participants' smoking-related health care, stating "the 'relationship' between sellers of a product and purchasers of that product" is not an appropriate basis for section 323 liability); *Gunsalus*, 674 F.Supp. at 1157 (granting summary judgment on section 323 claim, stating tobacco company's public pledge of "aid and assistance to the research effort into all phases of tobacco use and health" did not "constitute an assumption of a duty to [individual smokers] to perform research and inform [them] of all dangers of cigarette smoking"). We conclude statements by manufacturers such as those alleged in the plaintiff's petition are not an "undertaking" within the scope of section 323.

VIII. *Does Iowa Law Allow a Plaintiff to Recover From a Cigarette Manufacturer Under a Manufacturing Defect Theory When the Cigarettes Smoked by Plaintiff Were in the Condition Intended by the Manufacturer?*

■ Under the principles set forth in the Products Restatement adopted today, "[a] product is defective when, at the time of sale or distribution, it contains a manufacturing defect...." Products Restatement § 2. A product "contains a manufacturing defect *when the product departs from its intended design* even though all possible care was exercised in the preparation and marketing of the product." *Id.* § 2(a) (emphasis added). Clearly, then, under Iowa law, a plaintiff may not recover from a cigarette manufacturer under a manufacturing defect theory when the cigarettes smoked by the plaintiff were in the condition intended by the manufacturer.

Although the answer to the certified question is clear under the law set out in the Products Restatement, many courts have reached the same conclusion in applying the principles of Restatement (Second) of Torts. *See, e.g., Wheeler v. Ho Sports Inc.*, 232 F.3d 754, 757 (10th Cir.2000) ("A

product is defective in manufacture if it 'deviates in some material way from its design or performance standards. The issue is whether the product was rendered unsafe by an error in the manufacturing process.' Errors in process are often established by showing that a product, as produced, failed to conform with the manufacturer's specifications." (Citations omitted.)); *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.,* 97 F.3d 1050, 1055 n. 4 (8th Cir.1996) (" 'A manufacturing defect exists only where an item is substandard when compared to other identical units off of the assembly line.' "); *Guilbeault v. R.J. Reynolds Tobacco Co.,* 84 F.Supp.2d 263, 280 (D.R.I. 2000) ("To establish a manufacturing defect, 'a plaintiff must show a product defect caused by a mistake or accident in the manufacturing process.' " (Citation omitted.)); *Stoffel v. Thermogas Co.,* 998 F.Supp. 1021, 1033 (N.D.Iowa 1997) (" 'A manufacturing defect . . . results when a mistake in manufacturing renders a product that is ordinarily safe dangerous so that it causes harm.' " (Citation omitted.)) (applying Iowa law); 2 Dobbs § 362, at 1002 ("The plaintiff may show a [manufacturing] defect by direct evidence that points to the defect and identifies it as a departure from the defendant's intended design.").

IX. *Does Iowa Law Allow Plaintiff to Recover From a Cigarette Manufacturer for Breach of Implied Warranty of Merchantability When the Cigarettes Smoked by Plaintiff Were in the Condition Intended by the Manufacturer and Plaintiff Alleges Defendants' Cigarettes Are "Substantially Interchangeable"?*

Because the implied warranty of merchantability is statutory, we begin our dis-cussion of this issue with a reference to the governing act:

1. Unless excluded or modified (section 554.2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .

2. Goods to be merchantable must be at least such as

 *a.* pass without objection in the trade under the contract description; and

 *b.* in the case of fungible goods, are of fair average quality within the description; and

 *c.* are fit for the ordinary purposes for which such goods are used; and

 *d.* run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

 *e.* are adequately contained, packaged, and labeled as the agreement may require; and

 *f.* conform to the promises or affirmations of fact made on the container or label if any.

Iowa Code § 554.2314 (1999).

The plaintiff claims the cigarettes sold by the defendants were not "fit for the ordinary purposes for which such goods are used" because the cigarettes were carcinogenic and addictive. *See id.* § 554.2314(2)(*c*).[5] He argues that a design defect could infect an entire product line, thereby rendering the product unmerchantable, even though the product is in the condition intended by the manufacturer and conforms to similar products.

**5.** Because the plaintiff's claim rests on sub-section (2)(*c*), our discussion of the implied

The defendants assert that "when a product is manufactured as intended and is like other products of that type, there is no breach of the implied warranty of merchantability." If a health risk associated with use of a product renders the product unmerchantable, contend the defendants, then warranty claims could be brought against manufacturers "of butter, meat, and alcohol, not to mention bicycles, ladders, and knives, precisely because they all carry a risk of disease or injury."

In reviewing case law from other jurisdictions, we find support for both views. Courts have held that a product that is unreasonably dangerous or lacks adequate warning is likewise not fit for ordinary use. *E.g., Hill v. Searle Labs.*, 884 F.2d 1064, 1070 n. 10 (8th Cir.1989) ("[I]nadequate warning can be evidence of a breach of warranty on the part of a manufacturer."); *Bly v. Otis Elevator Co.*, 713 F.2d 1040, 1045 (4th Cir.1983) ("A manufacturer may breach its implied warranty of merchantability by failing to warn or instruct concerning dangerous propensities or characteristics of a product even if that product is flawless in design and manufacture."); *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 296, 297 n. 14 (3d Cir.1961) (reversing dismissal of claim for breach of implied warranty of merchantability based on allegation that cigarettes were unfit because they caused physical injury to the smoker, notwithstanding lack of allegation that the cigarettes "smoked by plaintiff were not of the same quality as those generally sold"); *Kyte v. Philip Morris Inc.*, 408 Mass. 162, 556 N.E.2d 1025, 1029 (1990) (denying summary judgment on plaintiff's breach of implied warranty claim based upon an alleged design defect, not in all cigarettes, but in Marlboro and Parlia-

ment cigarettes in particular that made those cigarettes "inherently carcinogenic and addictive"). In contrast, other courts have rejected the argument that an unreasonably dangerous product for purposes of strict liability is per se unmerchantable. *E.g., Spain v. Brown & Williamson Tobacco Corp.*, 230 F.3d 1300, 1310 (11th Cir. 2000) (ruling that complaint alleging that cigarettes "were unfit for the ordinary purpose for which they are used because they caused cancer, making them unreasonably dangerous" did not "state a claim for breach of an implied warranty of merchantability"); *Green v. Am. Tobacco Co.*, 409 F.2d 1166, 1166 (5th Cir.1969) (affirming judgment for cigarette manufacturer on breach of implied warranty claim, holding that warranty was not breached where there was no proof that cigarettes were adulterated); *Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F.Supp.2d 70, 94 (N.D.N.Y.2000) (dismissing implied warranty claim based on allegation that all cigarettes are carcinogenic, noting that "warranty of fitness for ordinary purposes 'provides for a minimal level of quality'" (citation omitted)); *Ark. Carpenters' Health & Welfare Fund*, 75 F.Supp.2d at 945 (holding plaintiff had failed to state a claim for breach of the implied warranty of merchantability based on allegation that "a typical cigarette, like all cigarettes, is 'generally defective'"); *Shell v. Union Oil Co.*, 489 So.2d 569, 571–72 (Ala.1986).

■ Although this court has not addressed the precise issue presented in the certified question, we think the answer lies in the interrelationship of warranty claims and tort product-defect claims, an issue we have considered. Almost twenty years ago, we observed that a warranty of merchantability "is based on a purchaser's rea-

warranty of merchantability has reference only to a warranty claim premised on an allegation that the product was not "fit for the ordinary purposes for which such goods are used." Iowa Code § 554.2314(2)(*c*).

sonable expectation that goods ... will be free of significant *defects* and will perform in the way goods of that kind should perform." *Van Wyk v. Norden Labs., Inc.,* 345 N.W.2d 81, 84 (Iowa 1984) (emphasis added). More recently, this court has held that proof of a "serious product defect" was sufficient to support submission of strict liability and breach of warranty theories. *Ballard v. Amana Soc'y, Inc.,* 526 N.W.2d 558, 562 (Iowa 1995). Notwithstanding a shared focus on defects, warranty claims have been distinguished from strict liability claims on the ground that " 'defects of suitability and quality are redressed through contract actions and safety hazards through tort actions.' " *Am. Fire & Cas. Co. v. Ford Motor Co.,* 588 N.W.2d 437, 439 (Iowa 1999) (citations omitted); *cf. Shell,* 489 So.2d at 571 ("The implied warranty mandated by this section of the U.C.C. is one of *commercial* fitness and suitability.... That is to say, the U.C.C. does not impose upon the seller the broader obligation to warrant against health hazards inherent in the use of the product when the warranty of commercial fitness has been complied with. Those injured by the use of or contact with such a product, under these circumstances, must find their remedy outside the warranty remedies afforded by the U.C.C."). Despite this distinction, we have found no error in submitting personal injury claims under both strict liability and breach of warranty theories. *See Mercer,* 616 N.W.2d at 621. In contrast, where only economic loss is alleged, recovery is limited to warranty claims. *E.g., Tomka v. Hoechst Celanese Corp.,* 528 N.W.2d 103, 107 (Iowa 1995) (affirming dismissal of negligence and strict liability claims in case alleging purely economic injuries).

Although this court has approved submission of both theories in personal injury cases, we have noted the same evidence sufficient to support a negligence claim based on product defects is likewise adequate to support a breach-of-implied-warranty claim. *Mercer,* 616 N.W.2d at 621. Similarly, this court has stated that while strict liability, negligence, and breach of warranty are "distinct theor[ies] of recovery, the same facts often give rise to all three claims." *Lovick,* 588 N.W.2d at 698.

As this review of our case law reveals, we have distinguished product claims premised on tort theories from product claims grounded on warranty theories on the basis of the damages sought rather than on the basis of the nature of the wrongful conduct. And, although we have limited cases involving only economic loss to warranty theories, personal injury plaintiffs are permitted to seek recovery under tort and warranty theories that in essence allege the same wrongful acts. We conclude, therefore, that under Iowa law a seller's warranty that goods are fit for the ordinary purposes for which such goods are used gives rise to the same obligation owed by manufacturers under tort law with respect to the avoidance of personal injury to others.

The Products Restatement is consistent with this position. It suggests that cases involving harm to persons should satisfy the definition of product defect under section 2, whether the claim is brought under a theory of implied warranty of merchantability or under a tort theory. Products Restatement § 2 cmt. *n,* at 35; *accord Vassallo v. Baxter Healthcare Corp.,* 428 Mass. 1, 696 N.E.2d 909, 923 (1998) (adopting Products Restatement test for failure-to-warn claim based on breach of implied warranty of merchantability); *cf.* 1 James J. White and Robert S. Summers, *Uniform Commercial Code* § 9.8, at 521 (4th ed.1995) (stating authors' belief that merchantability standard and tort standard for "defective condition" un-

der section 402A "are interchangeable"). We think this suggestion reflects current Iowa law: conduct that gives rise to a warranty claim based on fitness for ordinary purposes mirrors conduct that gives rise to tort liability for a defective product. Thus, warranty liability under section 554.2314(2)(c) requires proof of a product defect as defined in Products Restatement section 2.

■ Having defined the nature of the conduct that violates a warranty of merchantability, we now turn to the question before us: can a cigarette manufacturer be liable for breach of the implied warranty of merchantability when the cigarettes smoked by the plaintiff were in the condition intended by the manufacturer and the plaintiff alleges the defendants' cigarettes are "substantially interchangeable"? If the defect alleged by the plaintiff is a manufacturing defect, see Products Restatement § 2(a), then the answer is "no" for the same reasons that we have previously held that a plaintiff may not recover from a cigarette manufacturer under a manufacturing defect theory when the cigarettes smoked by the plaintiff were in the condition intended by the manufacturer. Obviously, the fact that the cigarettes were in the condition intended by the manufacturer would not preclude recovery under an implied warranty theory where the defect alleged arises from a defective design or inadequate instructions or warnings. See Products Restatement § 2(b), (c).

X. *Summary.*

Our answers to the certified questions can be summarized as follows:

1. In a design defect products liability case, what test applies under Iowa law to determine whether cigarettes are unreasonably dangerous? What requirements must be met under the applicable test?

Answer: The test and requirements of Restatement (Third) of Torts: Product Liability sections 1–2 (1998) apply.

2. Under Iowa law, can the defendants rely on comment i of section 402A of the Restatement (Second) of Torts to show that cigarettes are not unreasonably dangerous?

Answer: Because Iowa has abandoned section 402A and the requirement of unreasonably dangerous, the defendants cannot rely on the statement made in comment i pertaining to tobacco.

3. Under Iowa law, does the common knowledge of the health risks associated with smoking, including addiction, preclude tort and warranty liability of cigarette manufacturers to smokers because cigarettes are not unreasonably dangerous insofar as the risks are commonly known?

If yes, then:

a. During what period of time would such knowledge be common?

b. Is there a duty to warn of the risks associated with smoking cigarettes in light of such common knowledge?

c. Is reliance on advertisements, statements or representations suggesting that there are no risks associated with smoking, including addiction, justifiable in light of such common knowledge?

Answer: Generally speaking, consumer knowledge is merely one factor in assessing liability for design defects or for failure to warn of product risks. The remainder of this question calls for factual determinations that are beyond the scope of a certified-question proceeding. In the absence of a factual finding with respect to the common knowledge of consumers during the relevant time frame, we cannot determine whether

such knowledge would, as a matter of law, preclude liability under the principles set forth in the Products Restatement.

4. Under Iowa law, can a plaintiff bring a civil conspiracy claim arising out of alleged wrongful conduct that may or may not have been an intentional tort—i.e., strict liability for manufacturing a defective product or intentionally agreeing to produce an unreasonably dangerous product?

Answer: Yes, a plaintiff may base a civil conspiracy claim on wrongful conduct that does not constitute an intentional tort.

5. Under Iowa law, can a manufacturer's alleged failure to warn or to disclose material information give rise to a fraud claim when the relationship between a plaintiff and a defendant is solely that of a customer/buyer and manufacturer?

Answer: Yes, but only when disclosure is required (1) to correct misleading statements of fact made by the manufacturer with the intent to influence consumers, or (2) to correct statements of fact made by the manufacturer to influence consumers that were true when made but become untrue or misleading in light of subsequently acquired information.

6. Does an "undertaking" arise under section 323 of the Restatement (Second) of Torts, as adopted in Iowa, by reason of a product manufacturer's advertisements or statements directed to its customers?

Answer: Not within the factual parameters presented by this case.

7. Does Iowa law allow a plaintiff to recover from a cigarette manufacturer under a manufacturing defect theory when the cigarettes smoked by the plaintiff were in the condition intended by the manufacturer?

Answer: No.

8. Does Iowa law allow a plaintiff to recover from a cigarette manufacturer for breach of implied warranty of merchantability when the cigarettes smoked by the plaintiff were in the condition intended by the manufacturer and the plaintiff alleges the defendants' cigarettes are "substantially interchangeable"?

Answer: If the breach is based on a manufacturing defect, recovery is not allowed. If the breach is based on a defective design or inadequate instructions or warnings, recovery is not precluded under the stated facts.

**CERTIFIED QUESTIONS ANSWERED.**