# IN THE SUPREME COURT OF IOWA

No. 10–1889

Filed May 25, 2012

**TROY MCCORMICK** and
**LYNN MCCORMICK,**

      Appellants,

vs.

**NIKKEL & ASSOCIATES, INC.** d/b/a
**NAI ELECTRICAL CONTRACTORS,**
a Corporation,

      Appellee.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Cherokee County, Nancy L. Whittenburg, Judge.

A subcontractor seeks further review of a court of appeals decision reversing the summary judgment in its favor in a negligence case. **COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Steven D. Hamilton of Hamilton Law Firm, P.C., Storm Lake, for appellants.

Ned A. Stockdale of Fitzgibbons Law Firm, L.L.C., Estherville, for appellee.

**MANSFIELD, Justice**.

This case presents the question whether a subcontractor that properly performs electrical work on a jobsite, then locks up the work and transfers control to the property owner, owes a duty of care to an employee of the owner electrocuted six days later when the owner fails to deenergize the work site in contravention of various warnings and regulations. We conclude that no such duty is owed under the circumstances. Accordingly, we affirm the summary judgment granted by the district court and vacate the decision of the court of appeals reversing that grant of summary judgment.

## I. Facts and Procedural Background.

Little Sioux Corn Processors operates an ethanol plant located near Marcus, Iowa.[1] In 2006, Little Sioux was expanding the capacity of that plant. Part of that expansion involved electrical upgrades and changes. Little Sioux hired Fagen Engineering, Inc. to design the new electrical loop and to specify the electrical equipment to be included in the loop. Little Sioux purchased the electrical equipment needed for the electrical loop from Graybar Electric. Among the items purchased from Graybar were several switchgears. A switchgear is a large metal cabinet mounted on a pad that receives and transmits high-voltage electricity and, through mechanically operated switches, controls the overall flow of electricity within the distribution system.

Little Sioux hired a contractor, Schoon Construction Company, to work on the electrical loop by boring in and pulling the electrical cables that connected the components of the new electrical loop and placing and installing the switchgears on their mounting basements. Schoon in

---

[1]Because this case was resolved on a motion for summary judgment, we set forth the facts in the light most favorable to the nonmoving party, i.e., the plaintiff.

turn hired the defendant, Nikkel & Associates, Inc., to do "terminations," which involved hooking up electrical cables to terminals in the switchgears. This work was performed by early October 2006, and the lines were energized through the switchgears.

Little Sioux also purchased fault indicators from Graybar. These optional devices were to be mounted inside the switchgear cabinet. A fault indicator signals when there is an interruption or fault in the electrical circuit.

The original plan was for Nikkel to install the fault indicators inside the cabinets. However, it turned out the holes on the mounting brackets were too small. On November 7, 2006, Ken (Buford) Peterson, of Nikkel, spoke with Russell Konwinski, Little Sioux's maintenance manager, and offered to drill out the holes in the brackets. To save money, Konwinski declined the offer and said he would have his personnel modify the mounting brackets and install them in the switchgear cabinets.

Peterson left the work site pending the completion of that task. When Peterson left, the switchgear cabinets were closed and secured with penta-head bolts that could only be removed through the use of a special penta-head socket wrench, which Little Sioux had ordered along with the electrical equipment. In addition, the switchgear cabinets bore signs warning of the hazard of high voltage.

Six days later, on November 13, 2006, Little Sioux's Konwinski asked fellow employee Mike Jacobson, an electrician, to remove, drill out, and install the fault indicator brackets. Jacobson said he needed help because of other things going on, so Konwinski assigned Jeff Sangwin and Troy McCormick, the plaintiff, to assist Jacobson. Konwinski believed the switchgears were not energized and so informed the group.

Little Sioux's general manager, Steve Roe, knew that Switchgear #4, where the accident occurred, was energized on November 13. In fact, it had to be energized in order for the plant to be running because it was on the line between the main panel and the plant.

Peterson reenergized the electrical circuit from the main panel to Switchgear #4 before he left the site on November 6. Peterson claims he energized the line in the presence of Konwinski and Jacobson. However, in an affidavit, Konwinski denied he was present. Konwinski also stated in his affidavit, "I had asked Buford Peterson to tell when the power would be turned on but I was not told by him before November 13, 2006, that it was on."

It is undisputed that both Little Sioux's and OSHA's safety regulations required employees to deenergize and lock out or tag electrical equipment before beginning work. These rules required the employee to assume all electrical equipment was energized until proven otherwise. The lockout/tag procedures were not followed by the Little Sioux employees the day McCormick was injured.

After being assigned to remove, drill out, and install the brackets, Jacobson used the penta-head socket wrench to open two of the switchgear cabinets so the brackets could be removed and the holes redrilled. However, when Jacobson was called away to help with another project at the plant, he left McCormick and Sangwin to complete the work. Neither McCormick nor Sangwin had prior electrical training. McCormick used the wrench to open the cabinet door to Switchgear #4. After removing the bracket and redrilling the holes, McCormick received a severe electrical shock when he tried to reinstall the bracket in the cabinet. He survived but sustained substantial injuries.

McCormick and his spouse sued Nikkel, alleging it had control of the switchgear box and failed to warn him the switchgear was energized. Nikkel moved for summary judgment on the grounds that it owed no duty to McCormick because it did not have control of the switchgear box when McCormick was injured. Nikkel argued the relevant duties rested with Little Sioux, which owned and controlled the switchgear box and controlled the work being performed by McCormick at the time of the accident.

The district court granted Nikkel's motion for summary judgment. It agreed with Nikkel that it owed no duty to McCormick because Nikkel did not have control of the switchgear box when McCormick performed work on it and was injured. The court found, rather, that Little Sioux had retained control over the electrical work that caused McCormick's injury. As the court put it, "[T]he controlling issue is control of the premises." The court also concluded that whether Petersen warned anyone the switchgear was energized was not a material fact because "Little Sioux had a duty to provide a safe workplace to Troy McCormick, which includes testing electrical equipment to see if it is energized, in accordance with OSHA and Little Sioux policy."

McCormick appealed, and the court of appeals reversed the district court's grant of summary judgment. It reasoned that Nikkel was in control "when the alleged negligent act occurred," i.e., when Peterson energized the line prior to McCormick's injury.

Nikkel sought, and we granted, further review.

**II. Standard of Review.**

We review a trial court's grant of summary judgment for correction of errors at law. On motion for summary judgment, the court must: (1) view the facts in the light most favorable to the nonmoving party, and (2) consider on behalf

> of the nonmoving party every legitimate inference reasonably deduced from the record. Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." The existence of a legal duty is a question of law for the court to decide.

*Van Fossen v. MidAmerican Energy Co.*, 777 N.W.2d 689, 692–93 (2009) (citations omitted).

### III. Analysis.

**A. Duty and the Control Principle.** An actionable negligence claim requires "the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009) (citation and internal quotation marks omitted). "Whether a duty arises out of a given relationship is a matter of law for the court's determination." *Id.*

Historically, the duty determination focused on three factors: the relationship between the parties, the foreseeability of harm, and public policy. *Id.* at 834. In *Thompson,* we said that foreseeability should not enter into the duty calculus but should be considered only in determining whether the defendant was negligent. *Id.* at 835. But we did not erase the remaining law of duty; rather, we reaffirmed it. *Id.* at 834–36. In short, a lack of duty may be found if either the relationship between the parties or public considerations warrants such a conclusion.

In *Van Fossen,* we made clear again that our previous law of duty was otherwise still alive and well. Thus, we held that employers of independent contractors do not owe a general duty of due care under Restatement (Third) of Torts section 7, but owe only a limited duty as described in Restatement (Second) of Torts section 413. *Id.* at 696–97. We reiterated that "[u]nder the retained control standard, one who

employs an independent contractor is not liable unless he retains control of the contractor's day-to-day operations." *Id.* at 697. *Van Fossen* thus illustrated one example where the relationship between the parties resulted in no general duty of reasonable care. As we explained,

> The limited nature of the duty owed by employers of independent contractors takes into account the realities of the relationship between employers and their contractors. One of these realities is that employers often have limited, if any, control over the work performed by their contractors. Employers typically hire contractors to perform services beyond the employers' knowledge, expertise, and ability. The contractors' knowledge and expertise places them in the best position to understand the nature of the work, the risks to which workers will be exposed in the course of performing the work, and the precautions best calculated to manage those risks. These realities dictate that the persons in the best position to take precautions to manage the risks are the contractors. The policy of the law therefore justifies the rule placing the primary responsibility on the contractor for assuring proper precautions will be taken to manage risks arising in the course of the performance of the work. The same realities justify the well-established rules limiting the liability of employers of independent contractors to the circumstances specified in Restatement (Second) sections 413, 416, and 427. If liability were not limited in this fashion, inefficiencies would result as employers would be required to develop the knowledge and expertise in their contractors' fields so as to be prepared to understand even the ordinary risks involved in the work and assure that the precautions necessary to manage those risks are taken.

*Id.* at 698.

This law is of long standing in Iowa. For example, in *Robinson v. Poured Walls of Iowa, Inc.*, 553 N.W.2d 873, 874 (1996), a worker was injured while excavating a clogged sewer pipe that had been installed by the defendant. The defendant had hired the plaintiff's firm to do the repair work when the sewer line malfunctioned. *Id.* We affirmed the grant of the defendant's motion for summary judgment based on absence of duty, reasoning that the plaintiff's employer, not the defendant contractor, had control over the work. *Id.* at 875–76; *see also Hoffnagle*

*v. McDonald's Corp.*, 522 N.W.2d 808, 813 (1994) (holding that "[w]hether a franchisor owes a duty of care to its franchisee's employee . . . turns on the extent of the franchisor's retained control over the property and the daily operation of the restaurant"); *Downs v. A & H Constr., Ltd.*, 481 N.W.2d 520, 523–25 (Iowa 1992) (finding that a contractor owed no duty to the employee of a subcontractor who was injured by allegedly unsafe scaffolding because although the employer provided some of the materials for the scaffolding, the subcontractor controlled how the scaffolding was erected).

In *Van Essen v. McCormick Enterprises Co.*, we held a landlord that had installed a grain bin, but no longer controlled it, owed no duty to an employee of the lessee who was subsequently injured due to the allegedly hazardous condition of the bin. 599 N.W.2d 716, 720 (Iowa 1999). Although that case specifically involved the duties of an owner/lessor, we emphasized using italics, " 'The general rule and exceptions . . . reveal a common principle: *liability is premised upon control.*' " *Id.* at 720 n.3 (quoting *Allison by Fox v. Page*, 545 N.W.2d 281, 283 (Iowa 1996) (emphasis added)). We noted " 'the general rule that one who has transferred ownership and control is no longer held liable.' " *Id.* at 721 (quoting *Stalter by Stalter v. Iowa Res., Inc.*, 468 N.W.2d 796, 798 (Iowa 1991)).

This case is essentially the flip side of the control principle we have recognized in the foregoing cases. When Nikkel left the work site approximately a week before the accident, the switchgear was locked up and in a safe condition. Little Sioux, not Nikkel, had exclusive access to and control over this equipment. Just as the contractor is typically in a better position to manage risks when it is in control, the employer is typically in a better position to manage risks when the contractor left the

site a week ago and the employer is now in control. We believe the reasoning in *Van Fossen* leads inexorably to the district court's finding of no duty in this case.[2] If one who has transferred ownership and control is no longer held liable, as in *Van Essen,* it follows logically that one who transferred control *and never had ownership* also should not be liable.

Application of the control principle makes sense here from a public policy perspective. Consider the implications of a contrary rule that a party has created a nondelegable risk of harm if the electricity is on when it leaves the premises. No matter that the accident occurred a week later, or that the facility could not operate without electricity, or that the owner was fully aware of the relevant risks, or that the equipment had been locked up. To avoid potential liability, various parties (owners, landlords, repairpersons, etc.) would need to turn off utilities that involve any risk of hazard (e.g., gas, electricity) whenever they leave a property. These unnecessary shutoffs would result in burdens and inconveniences to businesses and the general public.

Courts in other states have repeatedly found that in the absence of actual control, a property owner owes no duty to a contractor or a contractor's employee who suffers injury from being electrocuted on the property owner's premises. *Merritt v. Bethlehem Steel Corp.*, 875 F.2d 603, 605–07 (7th Cir. 1989) (rejecting the claim of a contractor's employee that the premises owner had a duty to deenergize the lines where the contractor worked); *Wells v. Gen. Elec. Co.*, 807 F. Supp. 1202, 1211 (D. Md. 1992) (finding an employer owed no duty to a contractor's

---

[2]The fact that a nonemployee spouse was the plaintiff in *Van Fossen* added another degree of remoteness to the claim. 777 N.W.2d at 692. But as the above quotations demonstrate, our reaffirmation of the "retained control standard" and our discussion of the duties of employers of independent contractors were stated in broad terms. The reasoning in *Van Fossen* applies here.

employee in the absence of "latent or concealed dangers" or "*actual physical control over the work area*"); *Jackson v. Petit Jean Elec. Co-op.*, 606 S.W.2d 66, 68 (Ark. 1980) (finding a utility had no duty to deenergize its lines or warn an electrical contractor of "obvious hazards which are an integral part of the work the contractor was hired to perform"); *Durbin v. Culberson Cnty.*, 132 S.W.3d 650, 660–61 (Tex. Ct. App. 2004) (finding that the defendant owed no duty to a contractor who was electrocuted while changing out light bulbs on an energized pole, despite the contractor's argument that the defendant should have provided locked down switches); *cf. Groover v. Camp Dresser & McKee Inc.*, 420 F. App'x 358, 362 (5th Cir. 2011) (holding that a general contractor owed no duty to an employee of a subcontractor to warn of dangers of electrocution); *Edick v. Paul de Lima Co., Inc.*, 775 N.Y.S.2d 385, 386 (App. Div. 2004) (holding a company that serviced a coffee maker owed no duty to an employee who received an electric shock while attempting to clean the coffee maker).

As we noted above, this case is basically the other side of the same coin. The undisputed facts are that Nikkel was hired as a subcontractor to do some work on the switchgears. When the project got to a certain point, Little Sioux decided it would perform the next phase of the work itself instead of paying Nikkel to do it. So, Nikkel closed and secured the cabinets with penta-head bolts that could only be opened by a penta-head wrench in the possession of Little Sioux. In functional terms, Nikkel *contracted the job back* to Little Sioux, left the premises, and transferred control to Little Sioux. Like the district court, we do not see a material difference between "the employee of an independent contractor suing the owner, rather than an employee of the owner suing the independent contractor as in this case." The duty principles are the

same whether the employer turns the job over to the contractor who has actual control or the contractor turns the job back over to the employer who has actual control.[3]

The control rule persists under the Restatement (Third) of Torts, as we recognized in *Van Fossen*. Section 7(a) states, "An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." Restatement (Third) of Torts § 7(a), at 77 (2010). But this is also subject to "an articulated countervailing principle or policy," such as the control rule. *Id.* § 7(b); *see also id.* § 7 cmt. *a*, at 78 (stating that "[t]he principle or policy that is the basis for modifying or eliminating the ordinary duty of care contained in § 7(a) may be reflected in longstanding precedent").[4] The reason is simple: The party in control of the work site is best positioned to take precautions to identify risks and take measures to improve safety.

This is entirely consistent with Iowa's common law. Simply put, the cases involving parties that turn over control of premises to another party are "a category of cases" where "an articulated countervailing principle or policy" applies. *See Thompson*, 774 N.W.2d at 835.[5]

---

[3]Again, why should it make a difference whether the landowner turns over an energized line to a contractor or a contractor turns over an energized line to a landowner? *See Merritt*, 875 F.2d at 605–07; *Wells*, 807 F. Supp. at 1211; *Jackson*, 606 S.W.2d at 68; *Durbin*, 132 S.W.3d at 660–61. The control principle is the same.

[4]To put it another way, Nikkel did not create a "risk of physical harm" giving rise to a general duty under section 7(a) simply by energizing the line that it left locked securely to prevent unauthorized access. The risk arose only when Little Sioux used the penta-head wrench to gain access to the switchgear and allowed an untrained worker (McCormick) to work on it without first turning the power off.

[5]Of course, review of specific facts may be necessary to determine that there has been a complete transfer of control and that the claim does not involve defective work performed by the contractor. Nonetheless, we are still dealing with a "category of cases." *Thompson*, 774 N.W.2d at 835.

The court of appeals relied on *Thompson v. Burke Engineering Sales Co.*, 252 Iowa 146, 106 N.W.2d 351 (1960), in finding that Nikkel owed a duty in this case. However, in *Burke Engineering*, the defendant installed a *defective* metal ceiling that later collapsed. 252 Iowa at 148, 106 N.W.2d at 352–53. The problem there was a defective product supplied by the defendant, where the defect was latent. *Id.* If McCormick had been injured because Nikkel performed defective work inside the switchgear cabinets, that might be a *Burke Engineering*-type case. But the problem here was not defective work, it was an inherent hazard associated with an instrumentality no longer under the defendant's control.

The same observation applies to *Kragel v. Wal-Mart Stores, Inc.*, 537 N.W.2d 699 (Iowa 1995). This too was a "bad work" case. A snow removal contractor did a poor job of removing wet snow from a parking lot, leaving a layer of packed snow and ice behind. *Kragel*, 537 N.W.2d at 701–02. The plaintiff fell and sustained a fractured hip and a fractured elbow. *Id.* at 701. We held "[a] failed attempt to remove snow and ice can create an artificial condition subjecting the one who created the condition to liability." *Id.* at 707. We emphasized "the evidence was that [the contractor] affirmatively altered the slushy snow." *Id.* In any event, *Kragel* did not involve a transfer of control. *See generally id.*

A key distinction between *Burke Engineering* and *Kragel*, on the one hand, and this case, on the other, is that there was nothing wrong with the contractor's (Nikkel's) work. The only duty allegedly breached by Nikkel was a duty to warn. The duty to warn is especially susceptible to the control principle. When a party performs defective work, the negligence occurs at the time of performance, and the party that performed the work normally is in the best position to have prevented the

accident; when the allegation is a failure to warn, though, that failure (like any "failure") occurs over a period of time, and other parties may be in a better position to warn for multiple reasons. Therefore, we recognize various "no duty" rules in the warning area based on principles analogous to the lack of control. *See, e.g.,* Restatement (Third) of Torts: Prods. Liab. § 5, at 130 (1998) (limiting the liability of raw material or component suppliers and requiring proof that the raw material or component was defective in itself); *id.* § 6(d) & cmt. *e*, at 145, 148 (1998) (learned intermediary rule). For the foregoing reasons, we conclude that the control principle means Nikkel, the subcontractor, owed no general duty to McCormick, the employee of the property owner that had reassumed control of the equipment and the site.

Another way of looking at this case is to say that Nikkel did not create a "risk of physical harm" giving rise to a general duty under section 7(a) of the Third Restatement. *See Porter v. Iowa Power & Light Co.,* 217 N.W.2d 221, 232 (Iowa 1974). There was nothing wrong with Nikkel's work; any danger was the result of the inherent risks of active power lines. *See id.* at 233 ("We believe the presence near streets of electric transmission and distribution lines is a matter of common knowledge and a paving contractor can reasonably be expected to take precautions against contacting them."). When Nikkel reenergized the line, it also locked up the switchgear. The danger arose only when Little Sioux used the penta-head wrench to gain access to the switchgear and allowed an untrained worker (McCormick) to work on it without first turning the power off.

**B. "Assumed Duty."** Next, we turn to the question whether Konwinski's affidavit changes the case. We believe it does not. Iowa and other jurisdictions recognize the concept of an "assumed duty." *See*

*Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 177–78 (Iowa 2002); *see also* Restatement (Second) of Torts § 323, at 135 (1965).  That is, a duty can be imposed on a defendant who "undertakes" to render a service to another.  *See Wright,* 652 N.W.2d at 177–78 (holding that tobacco companies' statements that they would report on the results of their research into the health effects of cigarettes were not an undertaking to warn customers of those effects).  But Nikkel did not undertake to do anything here.  At most, according to Konwinski's affidavit, it failed to do what someone else asked it to do.  *See Wells*, 807 F. Supp. at 1209 (finding that General Electric had assumed no duty to disconnect the electricity to panel boxes given the lack of competent evidence that a GE employee had made affirmative comments that the boxes were dead).

**C. Duty Under Restatement (Second) of Torts Section 384.** Alternatively, McCormick relies in part on section 384 of the Restatement (Second) of Torts.

> One who on behalf of the possessor of land erects a structure or creates any other condition on the land is subject to the same liability, and enjoys the same freedom from liability, as though he were the possessor of the land, for physical harm caused to others upon and outside of the land by the dangerous character of the structure or other condition while the work is in his charge.

Restatement (Second) of Torts § 384, at 289.

Nikkel contends it bears no liability under section 384 because section 384 only imposes liability on the subcontractor for dangerous conditions "while the work is in his charge."  We agree.  Section 384 is not an exception to the control principle; it is an application of it.  That section only extends the special duty of the contractor "while the work is in his charge."  *Id.*  Two of the comments are particularly apt here:

> [T]he work entrusted to the servant or contractor may be such that it necessarily creates a condition which is

> dangerous unless further steps are taken. In such a case the servant or contractor may be liable if he leaves the job in this dangerous condition, unless he has reason to expect that the necessary steps will be taken. The fact that his employer has retained charge of taking such steps or has entrusted them to another contractor is usually sufficient to warrant the servant or another contractor in assuming that they will be taken.

*Id.* § 384 cmt. *e*, at 290.

> The rule stated in this Section applies to determine the liability of one who is entrusted by the possessor of land with the erection of a structure or the creation of any other physical condition on the land, for only such bodily harm as is caused while he remains in charge and control of the erection or creation of the structure or condition. It does not apply to determine his liability for harm caused after his charge and control of the work and his privilege to be upon the land for the purpose of accomplishing it is terminated in any manner. His charge and control is usually terminated by the possessor's acceptance of the completed work, but it may be terminated in a variety of other ways. For example, the possessor may, in pursuance or in violation of his contract, take the work out of the hands of the independent contractor before it is completed or may order a servant to stop the work entrusted to him. Again, the possessor himself may be ejected from the land by one who has a paramount title thereto, or an injunction may prevent the continuance of the work.

*Id.* § 384 cmt. *g*, at 291–92.

Little Sioux had retained for itself the work required to prepare the brackets to receive the fault indicators, thus eliminating any special duty that might have been owed by Nikkel when it exercised control of the switchgears. *Id.* § 384 cmt. *e*, at 290. Even if the energized switchgears were deemed a dangerous condition, Nikkel owed no special duty under section 384 because it had "reason to expect" Little Sioux employees would follow mandatory company and OSHA regulations before accessing the locked cabinet. *Id.* And under comment *g*, Nikkel would owe no special duty to protect against harm caused after its "charge and control of the work and [its] privilege to be upon the land . . . is terminated in

any manner." *Id.* § 384 cmt. *g*, at 291. Little Sioux instructed Nikkel not to perform the work on the brackets, and Nikkel was unable to complete its work until the brackets were revised by Little Sioux. Accordingly, Nikkel's control of the switchgears terminated until Little Sioux completed its work on the brackets. On this record, we conclude as a matter of law the work of repositioning the brackets was not in Nikkel's charge, and Nikkel therefore owed no special legal duty to McCormick under section 384 at the time of his injury.

**IV. Conclusion.**

For the reasons stated, we affirm the judgment of the district court holding that Nikkel owed no duty to McCormick in this case.

**COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Cady, C.J., and Waterman and Zager, JJ., join this opinion. Hecht, J., files an opinion concurring in part and dissenting in part in which Wiggins and Appel, JJ., join.

**HECHT, Justice (concurring in part and dissenting in part).**

While I agree with the majority's conclusion that Nikkel does not owe a special duty under the Restatement (Second) of Torts section 384, the majority's analysis of the general duty question demonstrates a fundamental misunderstanding of the distinction between duty and scope of liability and results in a conflation of the two issues.

The confusion is highlighted in the opening paragraph when the majority couches the issue as "whether a subcontractor that properly performs electrical work on a jobsite, then locks up the work and transfers control to the property owner, owes a duty of care to an employee of the owner electrocuted six days later when the owner fails to deenergize the work site in contravention of various warnings and regulations." "When liability depends on factors specific to an individual case, the appropriate analytical rubric is scope of liability." Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 7 cmt. *a*, at 78 (2010) [hereinafter Restatement (Third)]. In this case, the majority's rationale is substantially based on specific facts: that Nikkel had been absent from the work site for approximately a week before McCormick's injury; that Nikkel had locked the switchgear cabinet before leaving; that a hazard decal was visible on the switchgear cabinet; that Little Sioux was in control of the property at the time of the injury; and that McCormick failed to follow safety procedures confirming that the switchgear was not energized before attempting to work on it. While these factual considerations are, of course, relevant to the scope of liability issue, that issue was not raised in the district court or on appeal, and the majority does not purport to engage in an analysis of the scope

of Nikkel's liability. Rather, the majority relies on these factual, case-specific details in its duty analysis.

On the other hand, an appropriate duty analysis "depends on factors applicable to categories of actors or patterns of conduct." *Id.* "As a general rule, our law recognizes that every person owes a duty to exercise reasonable care to avoid causing injuries to others." *Feld v. Borkowski*, 790 N.W.2d 72, 75 (Iowa 2010). "Thus, in most cases involving physical harm, courts 'need not concern themselves with the existence or content of this ordinary duty,' but instead may proceed directly to the elements of liability." *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009) (quoting Restatement (Third) of Torts: Liab. for Physical Harm § 7(a), at 90 (Proposed Final Draft No. 1, 2005)). Only in "exceptional" cases, when the court can promulgate relatively clear, categorical, bright-line rules of law applicable *to a particular class of cases* should the court modify or displace an actor's general duty of reasonable care. *Id.* at 835. The majority's conclusion that "a subcontractor that properly performs electrical work on a jobsite, then locks up the work and transfers control to the property owner [does not owe] a duty to an employee of the owner electrocuted six days later when the owner fails to deenergize the work site in contravention of various warnings and regulations" is not a clear, bright-line rule of law applicable to a particular class of cases.[6]

---

[6]The majority's opinion reasons in part that it would be inefficient or impractical to impose liability on an electrical contractor who has energized a switchgear cabinet and locked it before leaving the work site. Fearing "burdens and inconveniences to businesses and the general public" if contractors are required to turn off utilities posing a risk of injury before leaving a work site, the majority would excuse contractors from the general duty of reasonable care under section 7. I am not convinced. Why should we conclude it would have been burdensome for Nikkel to deenergize the switchgear box before leaving the work site? Such a course of action would have assured Nikkel that it created no risk of harm to persons it expected to work on the fault indicator brackets in the near future. If Little Sioux wished to energize the loop before Nikkel returned to

Long before this court adopted the Restatement (Third) formulation of duty in *Thompson v. Kaczinski*, it was well established in this jurisdiction that the duty of contractors to exercise reasonable care does not evaporate with the completion of the contractor's work. *See Kragel v. Wal-Mart Stores, Inc.*, 537 N.W.2d 699, 707 (Iowa 1995) ("Our case law holds that the independent contractor remains liable even after the contractor's employer accepts the work.") (citing Restatement (Second) of Torts, § 385 (1965)); *Thompson v. Burke Eng'g Sales Co.*, 252 Iowa 146, 154–55, 106 N.W.2d 351, 356–57 (1960). Despite the majority's characterization of the reasoning in *Burke Engineering*, we made quite clear the contractor's duty of care does not derive from possession or control of land. It is instead a discrete duty arising from the creation of a risk of injury and extends temporally beyond the completion of the contractor's work and the owner's acceptance of it. *Burke Eng'g*, 252 Iowa 154–55, 106 N.W.2d at 356–57.[7]

This duty of a contractor to exercise reasonable care is not, as the majority opinion suggests, one that arises only when the contractor does bad or defective work. The duty arises instead whenever a risk of injury to others arises from the contractor's work without regard to whether the work is performed badly. This principle explains why a motorist owes a duty of care to others while driving (not just when driving badly), and it explains why a surgeon owes a duty of care while performing surgery (not

_____

finish its work, it could do so and take responsibility for any resulting risk. Of course, a fact finder could determine Nikkel had options other than deenergizing the switchgears in fulfilling its general duty of reasonable care, such as honoring Konwinski's request that he be notified when the switchgears were energized.

[7]It is apparent that the range of conduct engendering the general duty of care owed by a contractor is not limited to supplying inherently defective products posing latent hazards. *Kragel*, for example, makes clear that the duty is owed by a contractor who creates a risk of injury to pedestrians when clearing snow and ice from a shopping center's parking lot. *Kragel*, 537 N.W.2d at 707.

just when operating badly). The question of whether the driver or the surgeon has failed to use reasonable care under the circumstances addresses not whether a duty was owed in the first place, but whether that duty was breached. The majority's construct—concluding a contractor owes a duty of reasonable care only if he performs "defective work"—seems to make the existence of a duty turn on whether the contractor failed to exercise reasonable care. This is a novel approach to tort law. The majority's finding that Nikkel's acts or omissions did not constitute "defective work" is tantamount to a determination that Nikkel exercised reasonable care, yet it serves as the foundation for the majority's conclusion that Nikkel owed McCormick no duty. This is simply wrong. The existence of Nikkel's duty turns on whether it created a risk of injury when it energized the switchgear boxes before leaving the work site without notifying Konwinski—not on whether it connected the wires to the switchgears badly.

The well-established duty of care owed by contractors noted in our decisions in *Burke Engineering* and *Kragel* and expressed in Restatement (Second) of Torts section 385 was carried forward into the Restatement (Third). The contractor's general duty of care does not arise as a function of continuing possession and control of land, for the contractor's possession and control generally cease upon completion of the work. Having relinquished possession and control of the land, the contractor nonetheless owes the ordinary duty of reasonable care for risks created by the contractor's work.[8] A contractor who has completed work and is

---

[8]This distinction is crucial to the extent it explains why cases asserting negligence claims against land owners, *Merritt v. Bethlehem Steel Corp.*, 875 F.2d 603 (7th Cir. 1989), and *Wells v. Gen. Elec. Co.*, 807 F. Supp. 1202 (D. Md. 1992); electric utilities, *Jackson v. Petit Jean Elec. Co-op.*, 606 S.W.2d 66 (Ark. 1980), and *Durbin v. Culberson Cnty.*, 132 S.W.3d 650 (Tex. Ct. App. 2004); contractors, *Groover v. Camp Dresser & McKee, Inc.*, 420 F. App'x 358 (5th Cir. 2011), *Robinson v. Poured Walls of*

no longer in possession of the land is "subject to the ordinary duty for risks created by their work under § 7." Restatement (Third) § 49 cmt. *g*, at 10 (Tentative Draft No. 6, 2009).

> Section 385 of the first two Restatements of Torts provide that an agent who has completed work that is accepted by the principal is subject to the same liability as a manufacturer of a chattel who has given up possession of the chattel. This oblique way of imposing a duty of reasonable care on contractors whose work was completed reflects the waning influence of the privity doctrine, which limited a contractor's liability to those with whom the contractor was in privity of contract. After the privity rule was left behind beginning with *MacPherson v. Buick Motor Co.*, 111 N.E. 1050, 1053 (N.Y. 1916), the liability of a chattel manufacturer extended to others beyond the person who purchased the chattel. Similar to the privity doctrine, the "completion and acceptance" doctrine insulated a contractor who completed construction on real property and turned the completed work over to the owner. With the abrogation of privity, that rule was also replaced. . . . Numerous modern cases accept the rule of § 385.

Restatement (Third) § 49 rep. note to cmt. *g*, at 17 (Tentative Draft No. 6, 2009).

Thus, this general duty of care extending beyond the completion of a contractor's work is clearly not a novel or revolutionary concept of law in this jurisdiction. It is a rule of law recognized in prior decisions of this court for more than fifty years, expressed by the Restatement (Second) of Torts as a principle of established law, and more recently restated in the Restatement (Third) of Torts.

---

*Iowa, Inc.*, 553 N.W.2d 873 (Iowa 1996), and *Downs v. A & H Constr., Ltd.*, 481 N.W.2d 520 (Iowa 1992); a landlord, *Van Essen v. McCormick Enters. Co.*, 599 N.W.2d 716 (Iowa 1999); and a vendor of coffee makers and coffee, *Edick v. Paul de Lima Co., Inc.*, 775 N.Y.S.2d 385 (App. Div. 2004), cited by the majority are neither dispositive of the general duty issue nor persuasive in this case. None of these cases asserted, as the McCormicks do in this case, that a subcontractor owed a general duty of care under section 7 as a consequence of the subcontractor's own creation of a risk of serious injury or death at a construction site.

Accordingly, even if Nikkel did not owe to McCormick any special duties as a possessor of land, or as a contractor temporarily in control of the construction site, it still owed a general duty of reasonable care under section 7 of the Restatement (Third) because it created a risk of severe injury or death by energizing the switchgears and failing to notify Konwinski as requested. The determination of whether this duty of care was breached by Nikkel and whether McCormick's injuries were within the applicable scope of liability are matters of foreseeability to be determined not by the court on summary judgment, but by a jury.[9] The majority opinion, emphasizing that the switchgear cabinet was adorned with a decal warning of the electrical hazard and locked by Peterson before he left the work site, and that Little Sioux's employees failed to follow lock-out/tag procedures on the day of McCormick's injury, confounds the duty analysis under section 7 of the Restatement (Third) with forseeability considerations relevant to the issues of breach of the general duty and scope of liability. As I have already noted, Nikkel's motion for summary judgment claimed entitlement to summary judgment solely on the duty issue—not on the issues of breach of duty or scope of liability.

The majority cites this court's decision in *Van Fossen v. MidAmerican Energy Co.*, 777 N.W.2d 689 (Iowa 2009), in support of its position that Nikkel owed no general duty of care to McCormick under the facts presented in the summary judgment record. In *Van Fossen*, we decided the owner of a power plant who was not in possession of a construction site owed no general duty of care to the wife of an

---

[9]Foreseeability of the risk is no longer a part of the duty analysis and is allocated to the fact finder, "to be considered when the jury decides if the defendant failed to exercise reasonable care." *Thompson*, 774 N.W.2d at 835.

independent construction contractor's employee who was exposed to asbestos and carried it home on his clothing. *Van Fossen*, 777 N.W.2d at 696–97. Nikkel argues, and the majority concludes, that the no-duty rule adopted in *Van Fossen* was based on the notion that the power plant owner did not retain control of the construction site and the associated asbestos exposure risk while the contractor performed its work.

I believe *Van Fossen* is distinguishable both in terms of the facts presented and the legal issues decided, and it is neither controlling nor instructive in the resolution of the duty issue in this case. In *Van Fossen* we were asked to decide whether the owner of a power plant owed a duty of care to the spouse of an employee of a construction subcontractor who was allegedly exposed to asbestos while laundering her husband's clothes at home. *Id.* at 691. In sharp contrast, the parties in the case now before the court ask us to decide whether a construction subcontractor owed a duty of care to an employee of the owner as a consequence of a risk of severe injury or death *created at the construction site by the subcontractor's own work*. In short, the stark factual differences in the facts presented in the two cases, the asymmetry of the roles played by the defendant actors in the construction projects in the two cases, and the obvious dissimilarities in the respective defendants' involvement in the creation of the alleged risks of injury in the two cases lead us to conclude the no-duty rule enunciated in *Van Fossen* should have no application in this case.

Beyond the fact that *Van Fossen* is clearly distinguishable and not instructive in our resolution of the general duty issue in this case, the majority misapprehends the reasoning in *Van Fossen*. Although we noted that the record in that case was "devoid of evidence tending to prove [the plant owners] exercised control over [the work of their

contractors]," the decision to recognize a no-duty rule was based on " 'an articulated countervailing principle or policy warrant[ing] den[ial of] . . . liability in a particular *class of cases*.' " *Id.* at 696 (quoting Restatement (Third) § 7(b), at 90 (Proposed Final Draft No. 1, 2005)) (emphasis added).[10] We recognized that our determination of a no-duty rule reflected the "realities of the relationship between employers and their contractors [including the reality] that employers often have limited, if any, control over the work performed by their contractors." *Id.* at 698. However, our decision was also based on the remoteness of the plant owners from the spouse of an employee of an independent contractor. *Id.* at 699. We expressed concern that imposing a general duty of reasonable care on the employer of a contractor extending to the spouse of the contractor's employee under the circumstances presented in *Van Fossen* "would arguably also justify a rule extending the duty to a large universe of other potential plaintiffs who never visited the employers' premises but came into contact with a contractor's employee's asbestos-tainted clothing [in various other remote settings]." *Id.* This large universe of other potential plaintiffs could have included taxi drivers, employees of dry-cleaning establishments, and others having no connection whatsoever to the plant-owner's premises. We concluded "such a dramatic expansion of liability would be incompatible with public

---

[10]Our holding was not merely that MidAmerican owed no duty to Mrs. Van Fossen, but that "[o]ne who employs an independent contractor owes no general duty of reasonable care to a member of the household of an employee of the independent contractor." *Van Fossen*, 777 N.W.2d at 696. Mrs. Van Fossen had never visited the defendant's construction site. *Id.* at 699. Our decision in *Van Fossen* was "a determination, a purely legal question, that no liability should be imposed on actors *in a category of cases*." Restatement (Third), § 7 cmt. *j*, at 82 (emphasis added). It was *not* an individualized forseeabililty-based determination that no general duty of care was owed to Mrs. Van Fossen because MidAmerican lacked possession or control of the construction site.

policy." *Id.* However, I believe our policy concerns in *Van Fossen* militating against the imposition of a duty upon the landowner are not present in this case. McCormick's claim for damages is asserted against a construction subcontractor whose own acts or omissions are alleged to have created a risk of injury to its employer's employee at the construction site. As I have already noted, the existence of the duty of care owed by subcontractors as a consequence of risks of injury they create at construction sites is already well established in Iowa law. Accordingly, I believe this case does not present, as *Van Fossen* did, an exceptional situation in which a no-duty rule would be appropriate.

The majority also relies on our decision in *Robinson v. Poured Walls of Iowa, Inc.,* 553 N.W.2d 873 (Iowa 1996), as authority for its conclusion that Nikkel owed no general duty to exercise reasonable care under the circumstances of this case. In that case, Poured Walls of Iowa hired an independent contractor, Jack Spaw, to excavate a sewer line. *Robinson,* 553 N.W.2d at 874. Spaw employed Robinson who was injured while doing the work. *Id.* at 874–75. Robinson sued Poured Walls of Iowa claiming the contractor violated special duties under Restatement (Second) of Torts sections 343 (duty owed by possessors of land for injuries sustained by invitees), 413 (duty owed by employer of independent contractor hired to perform work creating a "peculiar unreasonable risk of physical harm"), and 427 (duty of employer of independent contractor hired to perform work "involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work"). *Id.* at 875. The plaintiffs in *Robinson* did not claim that the contractor, Poured Walls of Iowa, owed a general duty to exercise reasonable care because it created a risk of injury to others through its own acts or omissions at the work site. They

instead alleged the contractor violated only special duties which were allocated based on possession and control under the Restatement (Second) of Torts. *Id.* Simply put, our decision in *Robinson* did not address the general duty of care alleged by the McCormicks and is therefore not on point. This is also true of the other decisions of this court cited today by the majority opinion. *See Hoffnagle v. McDonald's Corp.*, 522 N.W.2d 808, 815 (Iowa 1994) (franchisor owed no special duty to provide security against assaults by third parties on franchisee's property under Restatement (Second) of Torts sections 344 and 414 because franchisor lacked control); *Downs v. A & H Constr., Ltd.*, 481 N.W.2d 520, 524–27 (Iowa 1992) (contractor owed no special duty to an employee of a roofing subcontractor under Restatement (Second) sections 328E, 343 and 414 because the contractor did not retain sufficient control of the subcontractor's work). Although these precedents are authority for the proposition that Nikkel owed no *special* duty to McCormick under the circumstances presented in this case, they are not dispositive of the *general* duty issue under section 7 of the Restatement (Third) adopted by this court in *Thompson.*

We should not fear the salutary effect of the general duty of reasonable care adopted by this court in *Thompson.* It is a positive force. I find no articulated countervailing principle or policy that warrants denying or limiting the liability of electrical contractors as a class of actors for risks of injury created by their own acts or omissions at a construction site. Although Nikkel did not control the construction site or the particular task performed by McCormick at the time of his injury, the McCormicks contend Nikkel owed a general duty to exercise

reasonable care when it energized the switchgears and failed to inform Konwinski despite having been asked to do so.[11]

The majority's decision today recognizes a no-duty rule for what it characterizes as "a class of cases" in which a contractor has effected a complete transfer of control of the premises to another. Acknowledging that there may be fact questions in certain cases about the extent of the transfer of control and whether the contractor has performed defective work, the majority effectively concedes that the existence of a duty will turn on fact questions in particular cases. On this point, the majority confuses its duty analysis with the analysis of scope of liability. "When liability depends on factors specific to an individual case, the appropriate rubric is scope of liability." Restatement (Third) § 7 cmt. *a*, at 78.

Whether Nikkel exercised reasonable care under the circumstances by locking the cabinet, relying on warnings posted on the cabinet, and expecting Little Sioux employees to follow mandatory OSHA and company safety policies, are matters related to foreseeability, breach of duty, and scope of liability—all issues properly reserved for a jury's assessment. Accordingly, I would reverse and remand for trial.

Wiggins and Appel, JJ., join this concurrence in part and dissent in part.

---

[11]As I have already noted, the question of whether the McCormicks engendered a fact question as to whether Nikkel *breached the duty* of reasonable care by failing to give notice to Little Sioux that the switchgears were energized or by failing to take other action to eliminate the risk of injury was not decided by the district court and is therefore not a matter before this court on appeal. Similarly, Nikkel's motion for summary judgment did not raise the question whether a fact issue is engendered in the summary judgment record as to whether any injuries sustained by the McCormicks were within the scope of Nikkel's liability.